OPINION
{¶ 1} Defendant-appellant, Anthony A. Wallace, appeals from the judgment of the Franklin County Court of Common Pleas entered upon a jury verdict convicting him of one count of aggravated burglary, one count of felonious assault, and five counts of rape. For the following reasons, we affirm that judgment.
 {¶ 2} On October 3, 2005, Melinda Gray lived with her boyfriend, Jesse Linlee, and her two young children in a two-story, three-bedroom home on Belvidere Avenue in Columbus, Ohio. At approximately 4:00 a.m., Ms. Gray awakened Mr. Linlee for work, *Page 2 
and he left shortly thereafter. Ms. Gray went to the bathroom and then returned to her second-floor bedroom.
 {¶ 3} A short time later, Ms. Gray awoke to a noise in the bedroom and saw a man hovering over her. The man jumped on top of her and cut her face with a knife; she bled profusely from the wound. When she screamed, he put a pillow over her face and tried to smother her. She attempted to fight him off and was eventually successful in turning her head enough that she could breathe. The man then directed her to put a pillowcase over her head and lie on her back on the bed. He spread her legs apart, licked her vagina and rectum, and penetrated her vagina with his penis. He then penetrated her rectum with his penis while she was on her back. Defendant then forced her to get on her hands and knees on the bed; he got behind her and engaged in vaginal and anal intercourse again. Although he penetrated both her vagina and rectum, he did not ejaculate. The man kept the knife to Ms. Gray's face during the entire attack. He then ordered her to perform fellatio on him; he ejaculated into her mouth and told her to swallow the semen.
 {¶ 4} Thereafter, the man instructed Ms. Gray to go into the bathroom and urinate. When she finished, he ordered her to spread her legs; he then washed her vagina and rectum with shower gel that contained what Ms. Gray described as "little gray balls." (Tr. 102.) The man then asked Ms. Gray if anyone else was in the house. When she responded that her five-year-old son and three-year-old daughter were present, the man threatened that when he was "done" with her he was "gonna go get" her son. (Tr. 87.) Ms. Gray told him he could have the $100 she had sitting on top of the television set in her bedroom if he left her son alone. The man then left the bathroom and told her to *Page 3 
stay there until she heard him leave the house. Ms. Gray heard the man walk into her bedroom, walk down the stairs, and exit the house through the front door.
 {¶ 5} Ms. Gray returned to her bedroom and called the police. When she went downstairs to wait, she noticed that all the windows, which did not have screens, were open. She surmised that the man opened the windows to obtain entry to the house. A police officer arrived shortly thereafter. As she reported the incident, she became increasingly distraught and vomited as a result. She wiped her mouth on a child's sock she found on the living room floor.
 {¶ 6} Emergency medical personnel transported Ms. Gray to a nearby hospital. A sexual assault nurse examiner, Kailey Mahan, performed an external physical examination, as well as an internal pelvic examination, and prepared a report of her findings. (State's Exhibit B.) According to Ms. Mahan, Ms. Gray presented with a "flat affect," meaning she was not crying or smiling; this "flat affect" is typical of a person who suffers a trauma. (Tr. 203-204.) The physical examination revealed bruises and a laceration on Ms. Gray's face; the laceration still had dried blood on it. The pelvic examination revealed abrasions and a bath bead on Ms. Gray's vagina. (Tr. 209.) According to Ms. Mahan, these physical findings were consistent with the history relayed by Ms. Gray. Ms. Mahan also performed a rectal examination, which revealed no injuries. According to Ms. Mahan, this physical finding was also consistent with the history Ms. Gray provided, as she reported that she ultimately submitted to the rectal penetration in an effort to save her life. Ms. Mahan photographed these physical findings. (State's Exhibits C1-C9.) She also swabbed Ms. Gray's mouth, vagina, and rectum for DNA and *Page 4 
sealed the swabs in the rape kit. An emergency room physician assistant closed the laceration on Ms. Gray's face with seven stitches.
 {¶ 7} Columbus Division of Police Sexual Abuse Unit Detective David McKee interviewed Ms. Gray at the hospital. Detective McKee noted that Ms. Gray was "visibly upset" and "seemed traumatized." (Tr. 367, 393.) She provided a "very consistent, very forthright" statement regarding the incident and indicated that she did not know her assailant. (Tr. 393.)
 {¶ 8} Thereafter, Detective McKee went to the crime scene and directed the collection of evidence and taking of photographs. Among the items collected were the pillow, pillowcase, and sheets from Ms. Gray's bed and the child's sock on which Ms. Gray wiped her mouth after she vomited.
 {¶ 9} Detective McKee requested that the crime laboratory perform a complete DNA and blood analysis of the items collected from the crime scene and the rape kit. Columbus Division of Police Criminalist Debra Lambourne analyzed the evidence and prepared a report of her findings. (State's Exhibit F.) That analysis revealed that blood was present on the bedding items and that semen was present on the sock found at the crime scene and the vaginal swabs that were in the rape kit. Due to the small amount of cellular material present in the semen on the vaginal swabs, Ms. Lambourne was unable to obtain a male profile. She was, however, able to obtain a male profile from the cellular material present in the semen contained on the sock.
 {¶ 10} Following her release from the hospital, Ms. Gray and her family stayed with her father for two weeks; they eventually moved into another house. At some point during the time Ms. Gray lived with her father, she and Mr. Linlee returned to the *Page 5 
Belvidere house to pack their belongings. Upon her arrival, Ms. Gray called the police to report that someone had broken into the house and stolen several items. While she waited for the police, she noticed a man riding a yellow bicycle. When the police arrived, she reported that the man on the yellow bicycle could be the person who attacked her.
 {¶ 11} Three weeks after the assault, police arrested defendant approximately five blocks from the crime scene. A search incident to the arrest uncovered a small, dagger-style knife in defendant's right coat pocket. Following the arrest, Detective McKee collected DNA from defendant via oral swabs; he then submitted the swabs to the crime lab for comparison to the DNA evidence collected from the sock found at the crime scene. Ms. Lambourne performed the comparison analysis and prepared a report of her findings. (State's Exhibit G.) That analysis revealed that DNA contained in the semen on the sock matched the DNA obtained from the oral swabs collected from defendant.
 {¶ 12} On November 3, 2005, the Franklin County Grand Jury indicted appellant on one count of aggravated burglary in violation of R.C. 2911.11, a first-degree felony, one count of felonious assault in violation of R.C. 2903.11, a second-degree felony, and five counts of rape in violation of R.C. 2907.02, all first-degree felonies. One of the rape counts carried a repeat violent offender specification pursuant to R.C 2941.149.
 {¶ 13} The trial court appointed the Franklin County Public Defender ("public defender") to represent defendant. Pursuant to defendant's request, the trial court removed the public defender and appointed private counsel. Later, again pursuant to defendant's request, the trial court removed the previously appointed private counsel and appointed private counsel chosen by defendant. Defendant voluntarily waived his right to a jury trial and elected to be tried by the court on the repeat violent offender specification *Page 6 
only. Thereafter, the case proceeded to jury trial, and the jury convicted defendant on all counts in the indictment. Following a hearing, the trial court convicted defendant of the specification, found him to be a sexual predator, and sentenced him in accordance with law.
 {¶ 14} Defendant timely appeals the trial court's judgment, advancing seven assignments of error, as follows:
 [I.] The trial court erred by refusing to allow Appellant to impeach Melinda Gray.
 [II.] The State failed to provide trial counsel with exculpatory and impeaching evidence until the trial had already commenced.
 [III.] The State failed to establish the proper chain of custody for various items of evidence.
 [IV.] The convictions in the instant case are not supported by sufficient evidence.
 [V.] The convictions in the instant case are against the manifest weight of the evidence.
 [VI.] Trial counsel was ineffective for failing to present evidence of the stated defense which was that Melinda Gray does crack and traded sex with Appellant for crack.
 [VII.] Trial counsel was ineffective for presenting two conflicting defense to the jury during trial.
 {¶ 15} Defendant's first assignment of error contends that the trial court erred in denying him the opportunity to impeach Ms. Gray's testimony through prior inconsistent statements. Ms. Gray testified on cross-examination that she did not recall being interviewed in January 2006 by Nancy Smith, an investigator for the public defender. Defense counsel later called Ms. Smith as a witness in defendant's case-in-chief. Ms. Smith testified that she interviewed Ms. Gray in January 2006; she took notes and *Page 7 
surreptitiously recorded the interview and later prepared a report and submitted it to the public defender who represented defendant at that time.
 {¶ 16} Defense counsel then inquired about certain statements Ms. Gray allegedly made during the interview. The prosecutor objected on hearsay grounds. Thereafter, defense counsel and the trial court engaged in the following colloquy:
 MS. CLARK: Your Honor, I'm asking this information on the basis that it is a contradictory statement to what Miss Gray said. And it's not hearsay.
 THE COURT: It's not for that purpose. You'd like it to be. But Miss Gray, my recollection was, she did not recall any conversations with people after the incident. I think the line of questioning establishing that there may have been another interview is entirely appropriate. But now we're getting into you're not contradicting. She simply said she didn't recall.
 MS. CLARK: Your Honor, I agree that Miss Gray said that she didn't remember being interviewed by anyone including Miss Smith. But I do recall that she testified as to how the room appeared. And I think that Miss Smith has — can make a statement that's in contradiction to that. And I think that's admissible.
 THE COURT: I've ruled otherwise, Miss Clark. Objection is sustained.
 MS. CLARK: So, Your Honor, are you saying that I can't ask her anything about the interview even if it's contradictory to what Miss Gray's already testified to?
 THE COURT: Clearly what this witness says regarding another person's statement is hearsay. The question is whether or not it's an exception to the hearsay rule. The only possible exception would be to contradict her. She never testified as to what she told this particular witness. Had she testified as to what she said to this witness then this would be permissible examination and an exception to the hearsay rule. Because she did not ever say what it was she said to this witness, there's nothing to contradict.
(Tr. 493-495.) *Page 8 
 {¶ 17} Defense counsel objected to the ruling and continued the examination of Ms. Smith. To that end, Ms. Smith reiterated that she interviewed Ms. Gray in January 2006, made a report of the interview, and submitted it to defendant's former counsel. Defense counsel asked that the report be marked as an exhibit but did not identify it by number. Defense counsel also requested that the report be admitted as evidence; the trial court stated it would consider it along with other defense exhibits at the close of defendant's case. Defense counsel never sought to admit the report and did not proffer either the report or Ms. Smith's proposed testimony.
 {¶ 18} Defendant contends the trial court improperly excluded Ms. Smith's testimony regarding statements Ms. Gray made during the January 2006 interview as inadmissible hearsay. Defendant maintains that the testimony constituted extrinsic evidence of a prior inconsistent statement admissible for impeachment purposes pursuant to Evid. R. 613(B).
 {¶ 19} Evid. R. 613(B) limits the use of extrinsic evidence to impeach a witness with either a prior inconsistent statement or prior inconsistent conduct. Weissenberger 2008 Ohio Evidence Courtroom Manual, 200. Extrinsic evidence is documentary or testimonial evidence submitted to the trier of fact after the conclusion of the testimony of the witness sought to be impeached. Id. A prior statement or conduct of a witness may be proved by extrinsic evidence only when two conditions are satisfied. Id. First, if the statement is to be offered solely for the purposes of impeaching the witness, a proper foundation must be laid and the witness must be afforded an opportunity to explain or deny the statement. Second, the subject matter of the statement must be a fact that is of consequence to the determination of the action other than the credibility of a witness, a fact that may be *Page 9 
shown by extrinsic evidence under certain other rules of evidence, or a fact that may be shown by extrinsic evidence under the common law of impeachment. Id.
 {¶ 20} Evid. R. 613(B)(1) requires the same foundation required by former law. Id. Accordingly, "the content of the statement, as well as the time, the place, and the persons to whom the statement was made or in whose presence the conduct was engaged in, must be disclosed to the witness prior to the introduction of any extrinsic evidence." Id. Evid. R. 613(B)(1) allows the trial court discretion to permit the introduction of extrinsic evidence in the absence of this foundation where "the interests of justice require." Id.
 {¶ 21} In this case, the trial court did not err in limiting defense counsel's questioning of Ms. Smith concerning the statements Ms. Gray made to her during the January 2006 interview. Defense counsel failed to lay a proper foundation during the cross-examination of Ms. Gray for admitting this evidence for impeachment purposes as required by Evid. R. 613(B)(1). Defense counsel asked Ms. Gray only if she recalled the interview with Ms. Smith; she did not question her regarding the detailed contents of the interview. Because Ms. Gray was never specifically asked about the statements she made during the interview, no foundation was laid for the introduction of Ms. Smith's testimony. Further, defendant has not established that the statements were inconsistent, as defense counsel failed to proffer either Ms. Smith's report or her proposed testimony. Accordingly, the trial court properly excluded Ms. Smith's testimony and we overrule the first assignment of error.
 {¶ 22} Defendant's second assignment of error contends the state withheld exculpatory and impeaching evidence in violation of Brady v.Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194. "Suppression by the prosecution of evidence that is favorable to the *Page 10 
accused and `material either to guilt or to punishment' is a violation of due process." State v. LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 27, quoting Brady, at 87. "Evidence suppressed by the prosecution is `material' within the meaning of Brady only if there exists a `reasonable probability' that the result of the trial would have been different had the evidence been disclosed to the defense." Id., citingKyles v. Whitley (1995), 514 U.S. 419, 433-434, 115 S.Ct. 1555. "`The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" Id., quoting Kyles, at 434. An accused bears the burden of proving a Brady violation and denial of due process.State v. Jackson (1991), 57 Ohio St.3d 29, 33.
 {¶ 23} Defendant contends the state withheld information until after the trial began that the rape kit included pubic hairs collected from Ms. Gray during the sexual assault examination. Defendant maintains that had this information been made available to him prior to trial, he could have had the hairs tested for illicit substances. Defendant contends that if the hairs tested positive for an illicit substance, such evidence would lend credence to the defense theory that Ms. Gray traded sex for drugs and would also impeach her testimony that she did not willingly engage in sex with defendant.
 {¶ 24} The record does not support defendant's claim that the state withheld information contained in the rape kit. On redirect examination, Ms. Mahan testified about the contents of the rape kit, State's Exhibit D, which included, inter alia, two envelopes marked, respectively, "[p]ubic hair combings" and "[c]ut pubic hairs." (Tr. 263-264.) On recross-examination, defense counsel elicited testimony from Ms. Mahan that she marked both envelopes "[n]ot present," meaning that she found no pubic hairs on Ms. *Page 11 
Gray; accordingly, the envelopes were empty. (Tr. 282.) As Ms. Mahan's testimony establishes that no pubic hairs were collected from Ms. Gray and included in the rape kit, the state could not have withheld such evidence.
 {¶ 25} Further, even if the rape kit included pubic hairs collected from Ms. Gray, defendant has failed to establish that the state withheld that information. Defense counsel never claimed that she had not been made aware of the contents of the rape kit prior to trial. Defense counsel did not object when the state identified and used the rape kit during redirect examination of Ms. Mahan. Although defense counsel objected when the state rested its case and offered the rape kit into evidence, the objection was only to the jurors viewing it, not to the fact that defense counsel had not been apprised of the contents of the rape kit prior to trial. Objection on one ground does not preserve other, unmentioned grounds. State v. Davis (1964), 1 Ohio St.2d 28, 33. For these reasons, defendant has failed to establish a Brady violation and a corresponding denial of due process. Accordingly, we overrule the second assignment of error.
 {¶ 26} Defendant argues in his third assignment of error that the state failed to establish the proper chain of custody for the rape kit and the police evidence collection list, and, as a result, the trial court should have instructed the jury that this evidence should be afforded minimal credibility.
 {¶ 27} The chain of custody is part of the authentication and identification requirements of Evid. R. 901. State v. Barzacchini (1994),96 Ohio App.3d 440, 457-458. The state maintains the burden of establishing the chain of custody. State v. Brown (1995),107 Ohio App.3d 194, 200, citing Barzacchini, supra. However, the state's burden is not absolute, as it "need only establish that it is reasonably certain that *Page 12 
substitution, alteration or tampering did not occur." State v.Blevins (1987), 36 Ohio App.3d 147, 150. A chain of custody may be established by direct testimony or by inference. State v. Conley (1971),32 Ohio App.2d 54, 60. The proponent of the evidence need not offer conclusive evidence as a foundation, but must offer sufficient evidence to allow the question as to authenticity or genuineness to reach the jury. State v. Ewing (Apr. 14, 1999), Lorain App. No. 97CA006944. The trier of fact has the task of determining whether there exists a break in the chain of custody. Columbus v. Marks (1963), 118 Ohio App. 359. Moreover, any breaks in the chain of custody go to the credibility or weight afforded to the evidence and not to its admissibility.Blevins, supra.
 {¶ 28} Ms. Mahan testified that she sealed and packaged the samples collected in the rape kit and locked it in the hospital evidence room refrigerator in accordance with standardized hospital procedures. She further testified that these standardized procedures mandate that the evidence room may be accessed only by sexual assault nurse examiners, hospital security personnel, and authorized law enforcement officers. She also stated that authorized law enforcement officers are required to document retrieval of a rape kit from the evidence room. She admitted on cross-examination that documentation pertaining to the rape kit established that she released it; however, the documentation does not indicate to whom she released it. She described this circumstance as "odd." (Tr. 284.) However, she identified the rape kit at trial and testified that it was in the same or similar condition as when it exited her custody.
 {¶ 29} Defendant points to Ms. Mahan's testimony regarding the deficient hospital documentation as evidence that the state failed to meet its burden of establishing the proper chain of custody. However, defendant's argument ignores Ms. Mahan's testimony *Page 13 
that the rape kit presented at trial was in the same or similar condition as it was when it left her custody.
 {¶ 30} As noted, the trier of fact is tasked with determining whether there exists a break in the chain of custody, and that determination goes to the weight or credibility of the evidence. Blevins, supra. Here, based upon the evidence presented, the jury could have reasonably determined that the state established that it was reasonably certain that the rape kit was not subject to alteration or tampering.
 {¶ 31} Regarding the evidence collection list, Detective Thomas Seevers, a member of the Columbus Division of Police Crime Scene Search Unit, testified that he prepared the document, State's Exhibit H-2, in conjunction with the collection of evidence at Ms. Gray's home. On cross-examination, Detective Seevers admitted that some of the identification boxes on State's Exhibit H-2 were not filled out, and, accordingly, the document might possibly apply to numerous crime scenes. On redirect examination, however, Detective Seevers testified that State's Exhibit H-2 correctly documented the evidence collected at the crime scene.
 {¶ 32} Defendant points to Detective Seevers' testimony regarding the inadequate completion of State's Exhibit H-2 as evidence that the state failed to meet its burden of establishing the proper chain of custody for the evidence collected at the crime scene. However, defendant's argument ignores Detective Seevers' testimony that State's Exhibit H-2 applied to this case. Accordingly, based upon the evidence presented, the jury could have reasonably determined that the state established that it was reasonably certain that the evidence collection list properly delineated the evidence collected at the crime scene. *Page 14 
 {¶ 33} As to defendant's argument that the trial court should have instructed the jury that the rape kit and evidence collection list were entitled to minimal credibility due to breaks in their respective chains of custody, we initially note that State's Exhibit H-2 was not offered into evidence. Further, defendant cites no authority for the proposition that the trial court was required to give such an instruction. Moreover, as the issue of the chain of custody goes to the weight to be afforded the evidence, the trial court's instructions to the jury that it was the sole judge of the facts, the credibility of the witnesses, and the weight of the evidence sufficiently encompassed the chain of custody issue. A jury is presumed to obey the trial court's instructions.State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 147. Accordingly, we overrule the third assignment of error.
 {¶ 34} We will address defendant's fourth and fifth assignments of error together. Defendant argues in his fourth assignment of error that his convictions were based upon insufficient evidence. Defendant contends in his fifth assignment of error that the jury's verdict was against the manifest weight of the evidence.
 {¶ 35} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, paragraph two of the syllabus. Accordingly, we shall separately discuss the standard of review applicable to each.
 {¶ 36} In State v. Jenks (1991), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a *Page 15 
reasonable doubt." Id. at paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
 {¶ 37} Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact. Thompkins, supra, at 386. In determining the sufficiency of the evidence, an appellate court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia
(1979), 443 U.S. 307, 319, 99 S.Ct. 2781. Accordingly, evaluation of witness credibility is not proper on review for evidentiary sufficiency.State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79. A jury verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact.State v. Treesh, 90 Ohio St.3d 460, 484, 2001-Ohio-4.
 {¶ 38} A manifest weight argument is evaluated under a different standard. The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other. State v. Gray (Mar. 28, 2000), Franklin App. No. 99AP-666. In order for an appellate court to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must unanimously disagree with the factfinder's resolution of the conflicting evidence. Thompkins, supra, at 387. Whether a criminal conviction is against the manifest weight of the evidence "requires an examination of the *Page 16 
entire record and a determination of whether the evidence produced attains the high degree of probative force and certainty required of a criminal conviction." State v. Getsy, 84 Ohio St.3d 180, 193,1998-Ohio-533.
 {¶ 39} In a manifest weight of the evidence review, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and new trial ordered. Thompkins, supra. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id. at 387, citing State v. Martin (1983),20 Ohio App.3d 172, 175. The weight to be given the evidence and the credibility of the witnesses are primarily issues to be decided by the trier of fact.State v. DeHass (1967), 10 Ohio St.2d 230. The trier of fact has the benefit of seeing and hearing the witnesses testify and is in the best position to determine the facts of the case. In re Good (1997),118 Ohio App.3d 371.
 {¶ 40} At the outset, we note that defendant asserts the same arguments under both his fourth and fifth assignments of error. Regardless of whether defendant is challenging his convictions on sufficiency grounds or on manifest weight grounds, we reject his arguments. The evidence reveals not only that the state carried its burden of proof and introduced sufficient evidence on each element of each of the crimes for which defendant was convicted, but that his convictions are supported by the manifest weight of the evidence. *Page 17 
 {¶ 41} Defendant was convicted of one count of aggravated burglary. Accordingly, the state had to prove beyond a reasonable doubt that defendant, by force, stealth, or deception, trespassed in Ms. Gray's home when she was present with purpose to commit a criminal offense therein and that defendant inflicted physical harm upon Ms. Gray or had a deadly weapon or dangerous ordnance on him. R.C. 2911.11.
 {¶ 42} Defendant first contends the state failed to prove that he entered Ms. Gray's home by "force, stealth, or deception." Ms. Gray testified that she did not invite defendant into her home and that it appeared that defendant opened the first-floor windows to gain entry. She further testified that she became aware of defendant's presence in her home only when she was awakened by a noise in her bedroom and saw him hovering over her while she lay in bed.
 {¶ 43} Defendant points to the cross-examination testimony of Detective Seevers, who testified that he neither observed nor collected any evidence that defendant forcibly broke into Ms. Gray's home. However, the state was not required to prove that defendant entered Ms. Gray's home by force. Rather, the state was required to prove that defendant entered Ms. Gray's home by force or by stealth or by deception. Although the term stealth is not defined in the Ohio Revised Code, this court has defined it as "`any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without permission.'" State v. Lane (1976),50 Ohio App.2d 41, 47, quoting the trial court. According to this court, "[t]his is a proper definition of the word and is the one which the average person would understand the word to mean." Id. Here, Ms. Gray's testimony, if believed, established entry by stealth, as the jury could reasonably find that defendant entered Ms. Gray's residence through an open first-floor *Page 18 
window and made his way to her second-floor bedroom quietly and furtively in order to avoid discovery.
 {¶ 44} Defendant next contends the state failed to prove that he inflicted physical harm upon Ms. Gray. R.C. 2901.01(A)(3) defines "physical harm" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." Here, the evidence, if believed, established that defendant stabbed Ms. Gray in the face with a knife, causing a wound that required seven stitches to close. Hence, the state sufficiently established the element of physical harm.
 {¶ 45} Defendant points to Ms. Gray's cross-examination testimony, where she stated that, in August 2005, her estranged husband hit her in the face. Defendant argues that this admission renders her testimony that defendant cut her face with a knife unreliable. However, Ms. Gray testified on redirect examination that the injuries she sustained in the August 2005 incident were no longer visible in October 2005. Further, other testimony and physical evidence corroborated Ms. Gray's testimony that defendant stabbed her with a knife during the October 2005 attack. Ms. Mahan testified that Ms. Gray presented at the hospital with a cut on her face and the emergency room physician assistant, Madonna McPherson, testified that closing the wound required seven stitches. Further, evidence collected at the crime scene included bloody bed sheets and a bloody pillowcase.
 {¶ 46} Defendant also contends that the state failed to prove that the knife used during the attack was a deadly weapon. For purposes of the aggravated burglary statute, "deadly weapon" has the same meaning as in R.C. 2923.11(A). That statute defines "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and *Page 19 
designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." This court has stated that "pursuant to R.C. 2923.11, a knife is clearly a deadly weapon." State v. Banks (June 15, 2000), Franklin App. No. 99AP-1237. See, also, State v.Jamhour, Franklin App. No. 06AP-20, 2006-Ohio-4987, ¶ 12 ("[a]s wielded, the knife met the definition of deadly weapon"). Accordingly, the evidence, if believed, established that defendant had a deadly weapon.
 {¶ 47} Defendant also argues that the state did not prove that the knife he was carrying at the time of his arrest was the one used to stab Ms. Gray during the attack. Defendant points to the cross-examination testimony of Detective McKee, who stated that no evidence of Ms. Gray's blood or DNA was found on the knife. However, Detective McKee testified on redirect examination that he did not expect to find any DNA or blood on the knife, given the length of time that had passed between the time of the attack and defendant's arrest. For these reasons, we find that defendant's conviction for aggravated burglary was supported by sufficient evidence and was not against the manifest weight of the evidence.
 {¶ 48} Defendant was also convicted of one count of felonious assault. Thus, the state had to prove that defendant knowingly caused serious physical harm to Ms. Gray or caused physical harm to Ms. Gray by means of a deadly weapon. R.C. 2903.11. We have already concluded that the state sufficiently proved that defendant caused physical harm to Ms. Gray and that he used a deadly weapon in doing so. Defendant raises the same arguments as those asserted in support of his claim as to the aggravated burglary conviction. Having already disposed of those arguments, we need not address them *Page 20 
here. Accordingly, we find that defendant's conviction for felonious assault was supported by sufficient evidence and was not against the manifest weight of the evidence.
 {¶ 49} Defendant was also convicted on five counts of rape. Therefore, the state had to prove that defendant engaged in sexual conduct with Ms. Gray when he purposely compelled her to submit by force or threat of force. R.C. 2907.02(A)(2). R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."
 {¶ 50} Here, Ms. Gray testified that defendant cut her face with a knife, placed a pillowcase over her head, and forced vaginal and anal sex upon her. Thereafter, he turned her over and again engaged in vaginal and anal sex. Finally, defendant forced Ms. Gray to perform fellatio on him until he ejaculated. According to Ms. Gray, defendant committed all of these acts while wielding a knife. This evidence, if believed, was sufficient to support the five rape convictions.
 {¶ 51} Further, other testimony and evidence corroborated Ms. Gray's testimony. Crime scene photographs depicted blood on the bed sheets and pillowcase. Ms. Mahan and Detective McKee testified that Ms. Gray's demeanor following the attack was that of a person who had been through a traumatic event. Ms. Mahan further testified that the physical examination revealed a laceration on Ms. Gray's face and abrasions and a bath bead on her vagina, and that these physical findings were consistent with the history relayed by Ms. Gray. Further, a sock found in the living room contained DNA matching *Page 21 
that of defendant, corroborating Ms. Gray's testimony that she wiped her mouth on the sock shortly after defendant ejaculated in her mouth.
 {¶ 52} Defendant maintains that the state did not prove that Ms. Gray was compelled to submit by force or threat of force. Specifically, defendant points to the absence of anal injuries as evidence that he did not compel Ms. Gray to submit by force or threat of force. However, Ms. Mahan testified that the absence of anal injuries was not unusual because Ms. Gray reported that she complied with defendant's orders.
 {¶ 53} Defendant also points to Ms. Mahan's testimony that Ms. Gray reported that she had consensual sex with someone on October 1, 2005, as evidence that her vaginal abrasions could have resulted from that event rather than an attack on October 3, 2005. However, Ms. Mahan also stated that it was improbable that a woman engaging in consensual sex would suffer vaginal abrasions.
 {¶ 54} Finally, defendant contends that the DNA found in semen contained on the sock corroborates his defense theory that Ms. Gray engaged in consensual sex with him in exchange for drugs. However, there was absolutely no evidence presented to support this theory. Indeed, no evidence was presented to establish that Ms. Gray was a drug abuser or that she had ever met defendant prior to the attack. Further, the DNA evidence actually corroborated Ms. Gray's testimony. Accordingly, we find that defendant's convictions for rape were supported by sufficient evidence and were not against the manifest weight of the evidence.
 {¶ 55} Having determined that defendant's convictions for aggravated burglary, felonious assault, and rape were supported by sufficient evidence and were not against *Page 22 
the manifest weight of the evidence, we overrule defendant's fourth and fifth assignments of error.
 {¶ 56} Defendant's sixth and seventh assignments of error contend that he received ineffective assistance of counsel at trial. TheSixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel. The burden of demonstrating ineffective assistance of counsel is on the defendant.State v. Smith (1985), 17 Ohio St.3d 98, 100. In order to prevail on an ineffective assistance of counsel claim, defendant must meet the two-prong test enunciated in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052. Initially, defendant must show that counsel's performance was deficient. Id. at 687. To meet that requirement, defendant must show that counsel's errors were so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. Defendant may prove counsel's conduct was deficient by identifying acts or omissions that did not result from reasonable professional judgment. Id. at 690. The court must then determine whether, in light of all circumstances, the identified acts or omissions were outside the range of professionally competent assistance. Id. In analyzing the first prong of the Strickland test, there is a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance. Id. at 689. Defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id., citing Michel v. Louisiana (1955), 350 U.S. 91,100, 76 S.Ct. 158.
 {¶ 57} The second prong of the Strickland test requires defendant to prove that counsel's deficient performance prejudiced him. Id. at 692. This requires that defendant show that counsel's errors were so serious as to deprive him of a fair trial, a trial whose *Page 23 
result is reliable. Id. at 687. Defendant would meet this standard with a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 58} Defendant first contends defense counsel's performance was deficient in failing to present evidence in support of the defense theory that Ms. Gray used drugs and engaged in consensual sex with defendant in exchange for drugs. Defendant claims that defense counsel should have had hair samples from the rape kit tested for illicit substances and should have called witnesses to testify that Ms. Gray was a drug abuser.
 {¶ 59} Initially, we note that the record contains no facts to indicate whether counsel failed to have the hair samples tested or whether counsel failed to make any effort to find witnesses to testify about Ms. Gray's alleged drug use. As this court stated in State v.Matthews, Franklin App. No. 03AP-140, 2003-Ohio-6307, "[i]t is impossible for a court to determine on a direct appeal from a criminal conviction whether counsel was ineffective in his representation where the allegation of ineffectiveness is based on facts dehors the record." Id. at ¶ 31, citing State v. Gibson (1980), 69 Ohio App.2d 91, 95. Defendant's claims are based on facts that cannot be ascertained from the record before us. Thus, we may not consider such claims in this direct appeal. A ruling in favor of defendant would be "`purely speculative.'" Id., quoting State v. Madrigal, 87 Ohio St.3d 378, 390,2000-Ohio-448.
 {¶ 60} Further, defendant's failure to have the hair samples tested could certainly be viewed as trial strategy. A reviewing court must extend great deference to counsel's trial decisions. Id. at ¶ 29. "Debatable trial tactics and strategies generally do not *Page 24 
constitute ineffective assistance of counsel." Id., citing State v.Clayton (1980), 62 Ohio St.2d 45, 49. Ms. Mahan testified that there was no indication of a need to drug-test Ms. Gray. Accordingly, defense counsel may have decided not to pursue drug-testing for fear that the results would have damaged the defense case.
 {¶ 61} In addition, defendant has failed to name any witnesses defense counsel could have called in his defense but did not. Such failure may mean that no such witnesses exist. If there was no additional witness testimony to be presented, defense counsel could not be ineffective in failing to present it.
 {¶ 62} Defendant also contends that defense counsel's performance was inadequate in failing to object to leading questions posed by the prosecution on redirect examination of Ms. Gray. Defendant takes issue with three questions which were utilized to demonstrate that questions are not evidence. The Ohio Supreme Court has held that the failure to object to leading questions does not usually constitute ineffective assistance of counsel. State v. Jackson, 92 Ohio St.3d 436, 449,2001-Ohio-1266. In reviewing the instances cited by defendant, defense counsel's decision to forego raising objections could be viewed as sound trial strategy, and we decline to second-guess that decision.
 {¶ 63} Defendant also maintains that defense counsel's performance was deficient in failing to move for an acquittal, pursuant to Crim. R. 29, at the close of defendant's case. Defense counsel's failure to make a Crim. R. 29 motion for acquittal is not ineffective assistance of counsel where such a motion would have been futile. Defiance v. Cannon (1990),70 Ohio App.3d 821, 826-827. The trial court may grant a Crim. R. 29 motion only where, construing the evidence most strongly in favor of the state, the evidence is insufficient to sustain a conviction.Jenks, supra. *Page 25 
 {¶ 64} Here, defense counsel made a Crim. R. 29 motion at the close of the state's case, arguing primarily that Ms. Gray "ha[d] no credibility." (Tr. 482.) The trial court denied the motion, noting that it found the victim to be "very, very consistent" and credible. (Tr. 487.) Where, as here, the state's case-in-chief linked the defendant to the charged crimes, failure to move for a judgment of acquittal under Crim. R. 29 does not constitute ineffective assistance of counsel.State v. Small (May 1, 2001), Franklin App. No. 00AP-1149.
 {¶ 65} Finally, defendant contends defense counsel's performance was deficient in presenting two conflicting defense theories. Defendant contends that defense counsel first claimed that Ms. Gray engaged in consensual sex with defendant in order to obtain drugs from him, but later argued that defendant was never present in Ms. Gray's home. Initially, we note that our review of the record reveals that defense counsel did not present conflicting defense theories. The defense theory throughout the entire trial was that Ms. Gray was a drug abuser who agreed to masturbate defendant in exchange for drugs; once the masturbation was completed, defendant wiped his semen on a sock he found on the floor and then refused to provide the drugs to Ms. Gray. To avenge the denial, Ms. Gray staged the crime scene, including cutting her own face with a knife, and reported to the police that she had been raped. Counsel presented this theory in opening statement, consistently developed it through vigorous cross-examination of the state's witnesses, particularly Ms. Gray, and argued it fervently during closing argument. Further, even assuming that defense counsel hinted at an alternative theory, the Ohio Supreme Court has stated that "it is not necessarily deficient performance for defense counsel to present inconsistent alternative theories to the jury." State v. Mundt,115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 134. *Page 26 
Further, a mid-trial change in strategy does not necessarily constitute deficient performance. Id.
 {¶ 66} Having determined that defendant has failed to establish that his trial counsel's performance was deficient, we need not examine prejudice. Accordingly, we overrule defendant's sixth and seventh assignments of error.
 {¶ 67} Having overruled defendant's seven assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
PETREE and SADLER, JJ., concur.
T. BRYANT, J., retired of the Third Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1