[Cite as *State v. Brown*, 2014-Ohio-2878.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-A-0065** |
| ANGEL M. BROWN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2012 CR 029.

Judgment: Affirmed.

*Nicholas A. Iarocci*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Virginia K. Miller*, Smith & Miller, 36 West Jefferson Street, #1, Jefferson, OH 44047 (For Defendant-Appellant).

COLLEEN MARY O'TOOLE, J.

{¶1} Appellant, Angel M. Brown, appeals from the October 9, 2013 judgment of the Ashtabula County Court of Common Pleas, sentencing her for conspiracy to commit aggravated murder following a jury trial. For the reasons that follow, we affirm.

{¶2} On January 19, 2012, the Ashtabula County Grand Jury indicted appellant on two counts of conspiracy to commit aggravated murder, felonies of the first degree. Count one was in violation of R.C. 2923.01(A)(1). Count two was in violation of R.C.

2923.01(A)(2). Appellant pleaded not guilty to both charges at her arraignment. Motion practice ensued.

{¶3} A jury trial commenced on August 6, 2013. Appellee, the state of Ohio, presented nine witnesses. The state's witnesses collectively established that Lisa Luke ("Luke") was married to Daniel Brown ("Brown"). Thereafter, the two divorced and appellant married Brown, who later died. Apparently due to financial motivations and "bad-blood" between appellant and Luke, appellant subsequently contacted James Holley ("Holley") to discuss and arrange the murder for hire of Luke. Appellant paid Holley $4,000 to carry out the plan. After believing Luke had been murdered, appellant gave instructions regarding her preference for disposing of Luke's body.

{¶4} The state's testimony at trial revealed that appellant and Holley initially met each other at a strip club where she was a dancer and he was a customer. Holley later trained appellant to be a professional boxer until he went away to prison for arson. The two regained contact again after his release.

{¶5} Holley testified appellant contacted him via telephone on January 9, 2012 because she wanted someone "whacked" and was willing to pay money. They later met in person at the TA truck stop. Holley indicated appellant told him she wanted Luke killed because she believed Luke was trying to get her inheritance from Brown. Appellant told Holley where Luke worked and that he should look her up on Facebook. Although Holley initially told appellant he would charge $5,000, the two negotiated a deal and settled on $4,000. They agreed to meet again the following day.

{¶6} Holley testified that on January 10, 2012, appellant went to his place of employment and gave him $4,000 (two stacks of $2,000 which were wrapped in bands

2

and contained within a Huntington Bank envelope). According to Holley, appellant closed her bank account and opened another so she did not leave a money trail. Holley merely wanted to take appellant's money and disappear. He never intended to kill Luke.

{¶7} After appellant left, Holley showed the money to his co-worker, Charles Shaw ("Shaw"). Shaw testified he initially observed Holley step outside after he received a phone call. When Holley returned, he showed Shaw an envelope containing money. After working that day, Holley went to pay some bills. Later that night, Holley went to an Erie casino to gamble.

{¶8} The next day, appellant texted Holley wondering if anything had happened yet. Holley texted appellant back that it would happen that night. He also told her to be careful using the phone. Appellant later called Holley wondering if the job was getting done. Holley responded that it would.

{¶9} After believing that appellant seriously intended to have Luke killed, Holley went to the Ashtabula County Sheriff's Department ("ACSD") and spoke with his long-time friend, Sheriff William Johnson ("Sheriff Johnson"). Holley told Sheriff Johnson that he took money from appellant to kill Luke and that he had spent all of it. Sheriff Johnson turned over the information to his detectives and an investigation began.

{¶10} Holley later received another text message from appellant, while at the ACSD, telling him not to go through with their plan and to keep $1,000 for his trouble. Holley did not respond. He subsequently received another text from appellant asking him if he got her latest text. He responded from the ACSD that he would call her later.

3

{¶11} Detective George Cleveland ("Detective Cleveland") with the ACSD testified he was involved in the investigation and monitored phone calls made by Holley to appellant. During the first recorded call, appellant feared that Luke's murder would be traced back to her. Holley told appellant he would not let that happen. Holley also told appellant he had spent all of her money and she would not be getting anything back. Appellant told Holley to just finish the job then.

{¶12} As a result of that first call, Detective Cleveland believed that appellant was serious about having Luke killed. Holley made a second recorded call to appellant from the ACSD. Holley requested more money from her and the two set up a meeting. While videotaped, Holley met with appellant on the front porch of her home. Appellant agreed to give Holley more money to kill Luke.

{¶13} After that meeting, Holley made a third recorded call to appellant from the ACSD falsely telling her that Luke was dead. Holley asked appellant what he should do with the body. Appellant told him to make it "disappear."

{¶14} Detective Cleveland asked Holley for the money appellant paid him. Holley responded that he had spent it all on bills and at the casino. However, Holley gave Detective Cleveland the Huntington Bank envelope the money came in as well as two $2,000 money wrappers.

{¶15} Detectives Cleveland and Sean Ward ("Detective Ward") with the ACSD participated in appellant's arrest. While transporting her to the station, Detective Ward testified that appellant "kept repeating over and over, she goes, you don't understand why I did it. She was going to take everything from me. She was going to take everything from me and my boy. She repeated over and over several times." Detective

4

Cleveland also testified that appellant made the foregoing statements while "crying uncontrollably."

{¶16} Detective Cleveland interviewed appellant at the ACSD. During the interview, appellant denied giving Holley any money. Appellant stated she was only joking with Holley when she said she wanted Luke dead.

{¶17} Vanderbilt Robison ("Robison"), a former lieutenant with the ACSD, testified he was also involved in the investigation and interviewed appellant. During the interview, appellant told Robison that both she and Holley hated Luke. Appellant lied about her finances and claimed she did not believe that Holley would kill Luke. Appellant denied ever giving Holley any money. Appellant also stated she told Holley not to kill Luke.

{¶18} A search of appellant's person during booking revealed the following items: a receipt from Bessemer System Federal Credit Union in Greenville, Pennsylvania ("Bessemer") for a cash withdrawal of $20,000 signed by appellant and time-stamped on January 10, 2012; bank receipts for checks that were cashed by her at Bessemer on January 10, 2012; a post-it note with the fax number for Bessemer; Holley's business card; a $2,000 money wrapper; a post-it note with the figure $25,699.73 written on it; and a business card from an official at Huntington Bank.

{¶19} Debit card records showed that appellant made a purchase at the TA truck stop on January 9, 2012. Video surveillance footage and bank records from Bessemer showed appellant and her $20,000 cash withdrawal. Also, bank records from Huntington Bank showed that appellant opened a savings account, checking account, and safe deposit box on January 10, 2012.

5

**{¶20}** Joy Peterson ("Peterson"), an office manager at Bessemer, testified that her bank wraps 20 hundred dollar bills together in $2,000 bands. Peterson stated the money wrappers Holley gave to the ACSD looked like the ones used at Bessemer. Peterson further said her bank's records showed appellant made a $20,000 withdrawal on January 10, 2012.

**{¶21}** Linda Singleton ("Singleton"), appellant's cousin, testified that in early 2012, appellant asked her for a $4,000 receipt but did not indicate for what reason. Singleton said appellant also asked her to give appellant receipts from Christmas presents that Singleton purchased. Singleton further indicated appellant asked her if she knew any "hit" men.

**{¶22}** Finally, Attorney Jeffrey Ford ("Attorney Ford") testified that Luke contacted him in either late 2011 or early 2012 to represent her daughter in a probate matter. Attorney Ford subsequently reviewed the probate file of the estate of Luke's deceased ex-husband, Brown. Luke and Brown had three children during their marriage. However, appellant claims there was a dispute about paternity. Brown's estate was opened for the purpose of a wrongful death action. Appellant was listed as the applicant of that action and two of Luke's children were missing as beneficiaries. The probate court application was ultimately corrected.

**{¶23}** After the state rested, the defense presented two witnesses as well as appellant. Brian Waldron ("Waldon"), a friend of appellant's, testified that he watched appellant's son on January 9, 2012 at her home. Appellant's other friend, Albert Bentley ("Bentley") was also at appellant's house when Waldron came over. Waldron and

Bentley indicated appellant left to get some marijuana. When she returned about 45 minutes later, appellant said she did not get any marijuana.

**{¶24}** Bentley testified he lived with appellant after her husband died in November 2011. He indicated that appellant had no money. While driving in the car with appellant on January 11, 2012, appellant had him send a text message to "someone" telling that person to keep the "thousand" dollars. However, Bentley said that he intended to text "$100."

**{¶25}** Lastly, according to appellant, she received $30,000 in insurance proceeds following her husband's death. Appellant later retained legal counsel to look into a wrongful death action. Appellant testified she tried to apply for Brown's Social Security benefits in December 2011 but was told that Luke, Brown's ex-wife, had already been there to claim another child. Appellant was told the matter had to be settled before she could receive benefits. As a result, appellant became upset because she did not believe that the child belonged to her deceased husband.

**{¶26}** Appellant testified Holley contacted her after her husband's death to offer his condolences and to rekindle their friendship. The two began speaking regularly. Appellant claimed Holley was involved in drug dealing and prostitution. She also claimed Holley asked her for a $6,000 loan. Appellant told him she could give him $4,000. Although he asked for the money several times, appellant stated she ignored him and never gave him any money. Appellant further testified she spoke with Holley on January 9, 2012 and asked him if he could get her some marijuana. Appellant asserted she met Holley at a truck stop, gave him $150, but did not receive any marijuana in return.

7

**{¶27}** The next day, appellant said she went to Bessemer, withdrew $20,000, and took the money to Huntington Bank. She stated she was having car trouble and wanted to move her money to a closer bank. Appellant later texted Holley and asked him if he got any marijuana for her. She then went to see him at work. They spoke about marijuana and Luke's name was mentioned. They both made negative comments about her, calling her a "stuck-up bitch." Appellant claimed that Holley offered to "rough up" Luke and she told him to "[h]it her once for me."

**{¶28}** On January 11, 2012, Holley went to appellant's house to tell her that Luke was dead. Appellant claimed, however, that she did not take him seriously. When she was later arrested, appellant claimed she told police that she did not do anything wrong. During her interview with police, appellant stated the whole thing was a "joke," that she never gave Holley any money, and never made an agreement with him to kill Luke.

**{¶29}** Following deliberations, the jury returned guilty verdicts on both counts of the indictment. On October 9, 2013, the trial court sentenced appellant to a total of nine years in prison. The court found the offenses to be of similar import and, thus, merged count two with count one. The court further notified appellant that she would be subject to five years of post-release control. Appellant filed a timely appeal and presents the following three assignments of error for our review:

**{¶30}** "[1.] Defendant-Appellant was deprived of her right to effective assistance of counsel pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Constitution of the State of Ohio.

8

**{¶31}** "[2.] The Defendant-Appellant's convictions are against the manifest weight of the evidence.

**{¶32}** "[3.] The lower court failed to properly consider the statutory principles and purposes of sentencing and the seriousness and recidivism factors required by statute."

**{¶33}** In her first assignment of error, appellant argues her trial counsel was ineffective because: (1) he failed to file a motion to suppress; (2) failed to object to the admission of her recorded statement; (3) failed to follow through with a motion to disclose deals; and (4) failed to request testing of the money bands and envelope.

**{¶34}** Regarding an ineffective assistance of counsel claim, this court stated in *State v. Henry*, 11th Dist. Lake No. 2007-L-142, 2009-Ohio-1138, ¶50-59:[1]

**{¶35}** "Preliminarily, we note that *Strickland v. Washington* (1984), 466 U.S. 668, 687 * * * states:

**{¶36}** "'(a) convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction (* * *) has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction (* * *) resulted from a breakdown in the adversary process that renders the result unreliable.'

---

1. *See also State v. Peoples*, 11th Dist. Lake No. 2005-L-158, 2010-Ohio-2523, ¶17-30.

9

{¶37} "'(* * *) When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.' *Id.* at 687-688. *State v. Bradley* (1989), 42 Ohio St.3d 136, 142 * * *, quoting *Strickland*, *supra*, at 694, states: '(t)o warrant reversal, "(t)he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'''

{¶38} "Very few criminal cases are reversed on the basis of an ineffective assistance of counsel claim due to the fact that there is no clear standard on what dictates 'trial strategy.' The present standard as set forth in *Strickland* sets a broad standard for lawyer competency. Under *Strickland* and its interpretation by Ohio courts, the mere possession of a law license, regardless of experience or criminal defense training, and the most tenuous and reckless of trial strategies, renders counsel effective.

{¶39} "In a civil context, on the other hand, in order to establish a cause of action for malpractice, a reasonableness standard is used in which a plaintiff must establish a tripartite showing: 'an attorney-client relationship giving rise to a duty, a breach of that duty, and damages proximately caused by the breach.' *Savage v. Kucharski*, 11th Dist. No. 2005-L-141, 2006-Ohio-5165, at ¶30, citing *Vahila v. Hall* (1997), 77 Ohio St.3d 421 * * *, syllabus.

{¶40} "In order to prevail on a claim of ineffective assistance of counsel, the defendant has the burden to establish two things: (1) that counsel's performance was deficient, and (2) that counsel's deficiency prejudiced the defense. *State v. Reynolds*

10

(1998), 80 Ohio St.3d 670, 674 * * *, citing *Strickland*, *supra*, at 687.  The defendant must produce evidence that counsel acted unreasonably by substantially violating essential duties owed to the client.  *State v. Sallie* (1998), 81 Ohio St.3d 673, 674 * * *.

**{¶41}** "A criminal defense attorney owes a duty of care to his client.  A 'duty' is defined as '(a) legal obligation that is owed or due to another and that needs to be satisfied; an obligation for which somebody else has a corresponding right.'  Black's Law Dictionary (8 Ed.2004) 543.

**{¶42}** "Under *Strickland* as interpreted by Ohio courts, attorneys are presumed competent, reviewing courts must refrain from second-guessing strategic, tactical decisions and strongly presume that counsel's performance falls within a wide range of reasonable legal assistance.  *State v. Carter* (1995), 72 Ohio St.3d 545, 558 * * *.  *See, also*, *State v. Burley* (Aug. 11, 1998), 7th Dist. No. 93-CA-204, 1998 Ohio App. LEXIS 3895, at *9 (a defendant is not guaranteed the right to the best or most brilliant counsel).

**{¶43}** "Upon demonstrating counsel's deficient performance, the defendant then has the burden to establish prejudice to the defense as a result of counsel's deficiency.  *Reynolds*, *supra*, at 674.  The reviewing court looks at the totality of the evidence and decides if there exists a reasonable probability that, were it not for serious errors made, the outcome of the trial would have been different.  *Strickland*, *supra*, at 695-696.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.  *Id.*

**{¶44}** "An attorney has a duty to zealously represent a criminal defendant.  'Criminal defense is an art, not a science.  Criminal defense attorneys adopt different approaches to their craft, based partly upon the demands of the particular case, and

partly upon their own personal characteristics. Ordinarily, defense counsel's particular style of defense is not a basis for a claim of ineffective assistance of counsel.' *State v. Benton* (Jan. 20, 1993), 2d Dist. No. 91 CA 71, 1993 Ohio App. LEXIS 172, at *7. Ohio Rule of Professional Conduct 1.1 prohibits a lawyer from representing a client in a legal matter that the lawyer is professionally incompetent to manage. In reading an appellate record, counsel's experience, or lack thereof, in trying a particular type of criminal case becomes evident.

**{¶45}** Appellant contends her trial counsel should have filed a motion to suppress statements she made in a recorded interview at the ACSD after her arrest.

**{¶46}** "'When claiming ineffective assistance due to failure to file or pursue a motion to suppress, an appellant must point to evidence in the record showing there was a reasonable probability the result of trial would have differed if the motion had been filed or pursued.'" *State v. Weimer*, 11th Dist. Lake No. 2013-L-008, 2013-Ohio-5651, ¶38, quoting *State v. Walker*, 11th Dist. Lake No. 2009-L-155, 2010-Ohio-4695, ¶15.

**{¶47}** Here, the trial court indicated it would have thrown out the tape had a suppression hearing occurred. However, based on the evidence presented, there is no reasonable probability the result of the trial would have differed if the motion had been filed, pursued, or granted. Even without the tape, there was other evidence to support the jury's guilty verdict.

**{¶48}** Regarding the tape, trial counsel apparently believed the best way to defend appellant was to let the recorded interview into evidence at trial. Appellant made no admission of guilt in the interview and repeatedly denied providing Holley with

12

$4,000 to kill Luke which the state argued was an act in furtherance of the conspiracy. Trial counsel's theory was that appellant never gave Holley $4,000 and that she was not serious about having Luke killed. Thus, trial counsel used the tape to prove the defense's theory. Trial counsel instructed the jury to watch the interview to see the look of relief on appellant's face when she learned that Luke was not dead. Trial counsel also advised the jury that they would see that appellant denied giving Holley $4,000 multiple times throughout the recorded interview. Thus, there is no reasonable probability the result of the trial would have differed if the motion had been filed or pursued. *Weimer, supra,* at ¶38.

{¶49} Appellant also asserts her trial counsel should have objected to the admission of the foregoing recording.

{¶50} "Trial tactics (including a failure to object) do not substantiate a claim of ineffective assistance of counsel." *Henry, supra,* at ¶78.

{¶51} As stated, appellant made no admission of guilt during the interview, indicated she was joking with Holley, and repeatedly denied giving Holley $4,000, which the state argued was an act in furtherance of the conspiracy. There was no Evid.R. 403 violation as appellant was not unfairly prejudiced by its admission. The recording was used, in addition to other evidence, to assist the jury in determining whether appellant was guilty of the charged offenses by showing appellant's mental state as well as to provide them with an opportunity to judge her credibility. Trial counsel was not ineffective for failing to object and appellant was not deprived of a fair trial.

{¶52} Appellant further maintains her trial counsel should have pursued a motion to disclose evidence of a deal between the state and Holley. She alleges that any

13

information obtained from such a motion could have been used as a means to damage Holley's credibility.

{¶53} We note that Holley's credibility was already damaged. He testified he was a convicted felon and served five years in a federal prison. Holley stated he wanted to get paid for reporting the crime. He tried receiving money from Crime Stoppers but was unsuccessful. He also indicated he requested immunity. During his interview with police, a detective discussed immunity with Holley before Holley was sent to appellant's home wearing a wire. Holley was told during the interview that a deal would be made with the prosecutor. Trial counsel was aware that an immunity deal had been made. Based on the facts presented, any additional evidence obtained from a motion to disclose evidence of a deal between the state and Holley would not have changed the outcome of appellant's trial.

{¶54} Lastly, appellant asserts her trial counsel failed to request finger print analysis or DNA testing on the money bands and the envelope introduced by the state. These items were provided by Holley to the ACSD. Holley indicated appellant gave him $4,000 in the envelope and that it was wrapped in the bands.

{¶55} Resolving this issue in appellant's favor would be purely speculative, as nothing in the record indicates what the results of any finger print analysis or DNA testing would have been. *See State v. Jordan*, 10th Dist. Franklin No. 11AP-691, 2012-Ohio-1760, ¶24. Because appellant cannot demonstrate, based on evidence in the record, that her trial counsel's failure to have finger print analysis or DNA testing prejudiced her, we reject this claim of ineffective assistance of counsel. *Id.*, citing *State v. Carter*, 89 Ohio St.3d 593, 606 (2000) (rejecting claim of ineffectiveness for counsel's

14

failure to pursue MRI testing in the penalty phase); *State v. Wallace*, 10th Dist. Franklin No. 08AP-2, 2008-Ohio-5260, ¶59 (rejecting ineffective assistance claim where claim could only be proven with evidence outside the record).

**{¶56}** Appellant's first assignment of error is without merit.

**{¶57}** In her second assignment of error, appellant contends her convictions for conspiracy to commit aggravated murder are against the manifest weight of the evidence.

**{¶58}** This court stated in *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-15 (Dec. 23, 1994):

**{¶59}** "'[M]anifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.

**{¶60}** "'In determining whether the verdict was against the manifest weight of the evidence, "(* * *) the court reviewing the entire record, *weighs the evidence* and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (* * *)'" * * *." (Citations omitted.) (Emphasis sic.)

**{¶61}** A judgment of a trial court should be reversed as being against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶62} With respect to the manifest weight of the evidence, we note that the jury is in the best position to assess the credibility of witnesses. *State v. DeHass*, 10 Ohio St.2d 230, paragraph one of the syllabus (1967).

{¶63} In reviewing and weighing all the evidence presented, we determine that a jury could reasonably conclude appellant was guilty of the charged offenses. The jury heard the evidence presented by the state that appellant gave Holley $4,000 to kill Luke. The jury also heard the defense's theory that appellant was only joking with Holley about wanting Luke dead and that she never gave him $4,000. The jury apparently placed great weight on and chose to believe the state's witnesses as opposed to appellant and her witnesses. *DeHass, supra,* at paragraph one of the syllabus. We cannot say that the jury clearly lost its way in finding appellant guilty of conspiracy to commit aggravated murder. *Schlee, supra*, at *14-15; *Thompkins, supra*, at 387.

{¶64} Appellant's second assignment of error is without merit.

{¶65} In her third assignment of error, appellant alleges the trial court failed to properly consider the principles and purposes of sentencing under R.C. 2929.11 and the seriousness and recidivism factors under R.C. 2929.12. She acknowledges her sentence was within the statutory range but believes it was too harsh. Appellant believes she has served enough time and should be released.

{¶66} This court recently stated in *State v. Arkenburg*, 11th Dist. Lake No. 2013-L-087, 2014-Ohio-1361, ¶6-8:

{¶67} "'Subsequent to *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856 * * *, appellate courts have applied a two step approach in reviewing felony sentences. First,

courts "examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision in imposing the term of imprisonment is reviewed under the abuse-of-discretion standard." *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, ¶26 * * * (* * *).

{¶68} "'A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing, which are "to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." R.C. 2929.11(A). A court imposing a sentence for a felony "has discretion to determine the most effective way to comply with the purposes and principles of sentencing set forth in section 2929.11 of the Revised Code." R.C. 2929.12(A). "In the exercise of this discretion, a court 'shall consider' the non-exclusive list of seriousness and recidivism factors set forth in R.C. 2929.12(B), (C), (D), and (E)." (Citation omitted.) *State v. Putnam*, 11th Dist. No. 2012-L-026, 2012-Ohio-4891, ¶8; R.C. 2929.12(A).

{¶69} "'There is no "mandate" for the sentencing court to engage in any factual finding under these statutes. Rather, "(t)he court is merely to 'consider' the statutory factors." *Foster* at ¶42. This standard continues to be applicable after the recent enactment of H.B. 86, which did not amend R.C. 2929.12. *Putnam* at ¶9, citing *State v. Alexander*, 1st Dist. Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶24 (R.C. 2929.12 is "not (a) fact-finding statute() like R.C. 2929.14").' (Parallel citation omitted.) *State v.*

*Beville*, 11th Dist. Ashtabula No. 2012-A-0057, 2013-Ohio-2139, ¶9-11." (Parallel citations omitted.)

**{¶70}** Here, appellant was found guilty of two counts of conspiracy to commit aggravated murder, felonies of the first degree. At sentencing, count two merged with count one and the trial court imposed a nine-year prison term. For first degree felonies, R.C. 2929.14(A)(1) states that "the prison term shall be three, four, five, six, seven, eight, nine, ten, or eleven years." Thus, appellant's nine-year sentence was within the statutory range under R.C. 2929.14(A)(1).

**{¶71}** At the sentencing hearing, the trial court gave careful and substantial deliberation to the relevant statutory considerations. The record establishes the court considered letters sent in support of both appellant and the prosecution. The court considered statements made by appellant and her counsel. Specifically, appellant claimed she did nothing wrong; she was well behaved while on house arrest; and her child needs her at home instead of in prison. The court also considered the prosecutor's statement that appellant has shown "no remorse."

**{¶72}** In addition, Luke spoke to the court concerning how this crime has "totally devastated" her life. Luke's son, Kolle Posey, also spoke to the court indicating how this crime has affected his life "a lot" and how this has made him and his mother "terrified."

**{¶73}** In conclusion, the trial judge stated the following at the sentencing hearing:

**{¶74}** "This is a very serious matter. Conspiracy to Commit Aggravated Murder, a murder where you were going to plan the demise of an innocent person.

18

**{¶75}** "* * *

**{¶76}** "* * *[A]s I review the evidence, you did everything you could possibly do to see that this murder took place.  * * *

**{¶77}** "If it hadn't been for Mr. Holley going to the police, we might have a homicide in this county.  * * *

**{¶78}** "* * *

**{¶79}** "The evidence, I think, in this case was overwhelming.  You were on tape.  There was a video made where you met once with Mr. Holley.  There were text messages, and this thing is, is in black and white.  There's no question in my mind that you committed this act.  And you committed many overt acts to further the actual death.

**{¶80}** "* * * This is not a probationable case.  It's not when you're talking about human life.

**{¶81}** "* * *

**{¶82}** "* * *[L]uckily there was no death.  You committed a very serious act, and there's got to be a serious punishment.  I don't think you should get the maximum penalty, because as I see in the Presentence Investigation Report you have no prior criminal record at all that I can find.  * * *

**{¶83}** "* * *

**{¶84}** "* * *[T]he Court's considered the purposes and principles of the sentencing statutes.  The overriding purposes are to punish offenders and most importantly to protect the public from future crime.  And you've pretty clearly shown a willingness to commit one of the most serious crimes known to man, and that's taking a

human life. There's nobody on this earth that can replace life, that can create it, and there's nobody that has the power to take it either.

{¶85} "So the Court has considered the purposes and principles of the sentencing statutes. I've considered the Presentence Reports. I've considered everything that's been put before me. Obviously, any form of probation would seriously demean - - would demean the seriousness of your conduct and would not adequately protect the public.

{¶86} "So it is the judgment and sentence of the Court that the defendant, Angel M. Brown, be sentenced to the Ohio Reformatory for Women at Marysville, Ohio, for a period of nine years.

{¶87} "* * *

{¶88} "* * *The Court hereby notifies the defendant that after you're released from prison, you will - - this will be mandatory - - you will have a period of post-release control for five years following your release from prison. * * *."

{¶89} Furthermore, the trial court stated the following in its sentencing entry:

{¶90} "[D]efendant's Sentencing Hearing was held pursuant to R.C. 2929.19. * * * [D]efendant * * * was afforded all rights pursuant to Criminal Rule 32. The Court has considered the record, oral statements, any victim impact statement, as well as the principles and purposes of sentencing under R.C. 2929.11, and has balanced the seriousness and recidivism factors under R.C. 2929.12.

{¶91} "* * *

{¶92} "The Court further finds that the defendant is not amenable to community control and that prison is consistent with the purposes of R.C. 2929.11.

20

{¶93} "* * *

{¶94} "The Court has notified the defendant that the sentence imposed automatically includes any extension of the stated prison term by the parole board, pursuant to R.C. 2967.28.

{¶95} "In addition the defendant will be subject to a mandatory five (5) year period of post-release control pursuant to R.C. 2929.14(F) and R.C. 2967.28(B) (C), after the defendant is released from prison."

{¶96} Thus, the record reflects the trial court gave due deliberation to the relevant statutory considerations. The court considered the purposes and principles of felony sentencing under R.C. 2929.11, and balanced the seriousness and recidivism factors under R.C. 2929.12. The court sentenced appellant within the statutory range under R.C. 2929.14(A)(1). Further, the record reveals the court properly advised appellant regarding post-release control. Therefore, the trial court complied with all applicable rules and statutes and, as a result, appellant's sentence is not clearly and convincingly contrary to law.

{¶97} Appellant's third assignment of error is without merit.

{¶98} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Ashtabula County Court of Common Pleas is affirmed.

CYNTHIA WESTCOTT RICE, J.,

THOMAS R. WRIGHT, J.,

concur.

21