[Cite as *State v. Abdullahi*, 2024-Ohio-418.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

    Plaintiff-Appellee,                      :             No. 21AP-350
                                          (C.P.C. No. 19CR-350)

v.                                                :

                                          (REGULAR CALENDAR)

Faizal M. Abdullahi,                              :

    Defendant-Appellant.                      :

---

D E C I S I O N

Rendered on February 6, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond*.

**On brief:** *The Law Office of Thomas F. Hayes, LLC*, and *Thomas F. Hayes*, for appellant. **Argued:** *Thomas F. Hayes*.

---

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Faizal M. Abdullahi, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of kidnapping, attempted rape, and felonious assault. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed October 17, 2019, plaintiff-appellee, State of Ohio, charged Abdullahi with one count of aggravated burglary, in violation of R.C. 2911.11, a first-degree felony; one count of kidnapping, in violation of R.C. 2905.01, a first-degree felony; one count of rape, in violation of R.C. 2907.02, a first-degree felony; and one count of felonious assault, in violation of R.C. 2903.11, a second-degree felony. The charges related to an incident involving A.T. on or about October 7, 2019. Abdullahi entered a plea of not guilty.

{¶ 3}    At the trial beginning April 26, 2021, the trial court appointed interpreters for both Abdullahi and A.T.  A.T., who is originally from Somalia but has lived in Columbus since 1999, testified that on October 7, 2019 she had been living at her third-floor apartment for about a month and one-half.  A.T. testified she had been out at a family wedding until late at night and that when she returned home, she saw a man outside the entrance of her apartment.  A.T. said she did not know the man but had seen him outside of her building before.  When she approached the apartment complex, A.T. said the man initially blocked the entrance.  She asked him to move but he refused, so A.T. said she stood outside and continued to ask him to move until she was able to get inside her apartment.

{¶ 4}    Once she was inside her apartment, A.T. said she was relaxing and watching YouTube when she fell asleep in her living room.  She woke up to a knock at her door and, without opening the door, asked who was there.  The person on the other side said he wanted water and asked A.T. to open the door.  A.T. said she could smell alcohol through the door.  A.T. also said she did not open the door but ignored the man and went back to the living room.  When she returned to the living room, A.T. said she fell asleep again.  Approximately an hour and one-half later, A.T. said she heard more loud banging at the door.  The man at the door kept saying he wanted water, and A.T. testified the man spoke to her in Somali and referred to her as his sister, asking her to help him.  A.T. said she told the man to leave or she would call the police.

{¶ 5}    After a period of silence, A.T. testified she thought the man left and she decided to check her door to be sure it was locked.  A.T. said she opened the door slightly and when she did that, the man put his arms through the doorway and grabbed her wrists.  According to A.T.'s testimony, the man then forced his way into the apartment, shut and locked the door, pulled her hair, and threw her on the ground.  While she was on the ground, A.T. said the man grabbed her throat with both of his hands and squeezed, causing her to feel like her "head was going to pop" and making it "painful to breathe."  (Tr. Vol. I at 91-92.)  A.T. said the man released the pressure briefly and then choked her a second time, this time applying more pressure that caused her vision to slowly fade to black.  She compared the sensation to feeling like she was drowning.

{¶ 6}    A.T. further testified that while the man had her pinned to the ground, he removed all of his clothes and flipped her over so that her stomach was on the ground.  A.T.

said the man tried to rip her dress off but could not get it to come off so he pulled it all the way up to her shoulders. At that point, A.T. said the man got on top of her and his penis was touching her butt with skin-to-skin contact. A.T. testified the man was moving back and forth and that his penis was going up and down on her buttocks. The prosecutor asked A.T. detailed questions about this portion of the incident, and the following exchange occurred:

Q. Was his penis ever between your butt cheeks?

A. It was in the outer part, yes.

Q. Did you ever feel his penis inserted into your anus?

A. No.

Q. Did you feel his penis in between your butt cheeks?

A. I would say the outer but not - - because I was clenching my butt. I was closing my legs as tight as I can because I didn't want that happening to me.

Q. Just to clarify, [A.T.], why were you clenching your butt?

A. Because I didn't want his penis to go inside.

Q. Did you remain on your stomach during this incident?

A. Shortly.

Q. What happened after he tried to insert his penis into your anus?

A. He flipped me. Now I was in my back position and he tried to - - it was a struggle. It was a struggle because I was closing both my legs tight. He wanted to put his penis, put his penis in my vagina.

Q. Did he?

A. No.

Q. How come?

A.  Because I was fighting him.  And he was a lot stronger than
me.

Q. Throughout this struggle, am I correct in understanding you,
when you said you were trying very hard to keep your legs and
your buttocks closed, and during that was he still on top of you?

A. Yes, he was.

(Tr. Vol. I at 97-99.)  When asked again about where she specifically felt the man's penis, A.T. testified she felt the man's penis inside her butt cheeks but not inside her anus.  A.T. said the man then strangled her a third time, and she again felt like she could not breathe, could not speak, and her vision turned blurry with black checkers.  She felt like she was close to passing out but did not lose consciousness.  While he was attacking her, A.T. said the man told her his name was Faizal.

{¶ 7}    A.T. testified she was eventually able to break free from the man's grasp by pleading to use the restroom and that when she broke free from his hands, she ran into her kitchen and started smashing dishes on the floor in the hopes a neighbor would hear the commotion.  When the man ran toward her in the kitchen, A.T. said she grabbed a knife but the man told her "[g]o ahead and kill me." (Tr. Vol. I at 102.)  A.T. said the man then grabbed a kitchen pot and threw it toward her, just missing her head and landing on the kitchen counter.  A.T. then started screaming hoping someone would hear her.  According to her testimony, the man then slowly started to get dressed while she continued to yell and scream even though using her voice was painful after being choked, and he eventually left her apartment.  She described the man as being dark skinned, approximately five feet eight inches tall, with a scar on his cheek and missing several teeth.  A.T. made an in-court identification of Abdullahi as the man who attacked her.

{¶ 8}    After the man left her apartment, A.T. said she called 911.  The state played a recording of the 911 call for the jury.  When police arrived, A.T. said she asked for medical attention and was taken to the hospital for examination.  Once at the hospital, A.T. said she was evaluated by a forensic nurse but that she refused to consent to a physical exam because she was scared.  A.T. also testified she was not sure if she had been raped because she was engaged in a struggle with the man the whole time he was on top of her.  When asked to explain what she meant, A.T. said she was closing her legs tightly the whole time but that

"when he flipped me, when I was [on] my stomach facing down on the floor I did feel his penis.  He was going up and down but not to the point where it went fully inside." (Tr. Vol. I at 119.)  A.T. said she gave the forensic nurse the dress she had been wearing during the attack.

{¶ 9}   A.T. testified the exam took most of the day and that she did not return to her apartment until close to 11:00 p.m.  When she returned to her apartment with her parents and her brother, who had driven from Cleveland to be with her, A.T. said she saw the man who attacked her outside her apartment complex again.  A.T. told her family that was the man who had attacked her, and then she called police.

{¶ 10} Mary Hogue, a patrol officer with the Columbus Division of Police who responded to the dispatch of a reported sexual assault, described A.T. as being in distress, crying, and having difficulty speaking.  Officer Hogue said A.T. told her that a man had been in the apartment hallway who appeared to be intoxicated and had asked A.T. for water but A.T. did not give him anything and went inside her apartment.  A.T. told Officer Hogue she had seen the man loitering around the apartment complex before but that she did not have a personal relationship with him.  Officer Hogue did not notice any visible injuries on A.T., but testified that A.T. was grasping her neck and indicating to Officer Hogue that her attacker choked her three times and she was in pain.  Medics arrived on the scene and Officer Hogue rode with A.T. to Saint Ann's hospital for evaluation.  Officer Hogue was wearing a body camera during her interaction with A.T. and the state played the body camera footage for the jury.

{¶ 11} Molly Downs, a sexual assault nurse examiner ("SANE"), testified she examined A.T. at the hospital on October 7, 2019 and documented her injuries.  In her report from the SANE exam, Downs described A.T. as withdrawn, tired, and having difficulty making basic decisions.  Downs testified that A.T. reported that a man named Faizal had forced his way into her home, physically assaulted her, and attempted to sexually assault her, though she said A.T. had difficulty remembering the details of the events, something Downs described as a common experience for someone who has experienced trauma.  Downs testified she observed a bite injury to the corner of A.T.'s mouth, a bruised and swollen area on her forehead, and an area on her neck that A.T. had reported as having experienced strangulation.  Additionally, Downs noticed that A.T. had difficulty projecting

her voice, and A.T. reported she had a sore throat and it was difficult for her to swallow. When asked if any vaginal or anal penetration occurred, A.T. responded that she was unsure. Downs said A.T. declined to undergo a genital exam.

{¶ 12} Law enforcement officers collected DNA samples from A.T.'s neck and from a pot handle at A.T.'s residence. Subsequent laboratory testing identified Abdullahi as the contributor of those DNA samples.

{¶ 13} At the close of the state's evidence, defense counsel made a Crim.R. 29 motion for acquittal relative to the rape count. Defense counsel argued that because A.T. testified there was no anal or vaginal penetration, the state failed to put forth evidence on all the elements of rape. The trial court responded it did not recall A.T.'s testimony with respect to penetration being so definitive and that her testimony could be interpreted in different ways, noting that the definition of intercourse within the meaning of sexual conduct for purposes of a charge of rape includes penetration no matter how slight. The trial court further noted that A.T.'s description of the struggle seemed to leave her unsure of whether or to what extent penetration occurred, and, for that reason, determined that the question of whether vaginal or anal penetration occurred is a question for the trier of fact to determine. Thus, the trial court denied the Crim.R. 29 motion.

{¶ 14} After the state rested, defense counsel called two witnesses: Abdullahi and one of his friends. Sadi Ismali Gurhan, a friend of Abdullahi, testified that he had seen Abdullahi interact with A.T. before and that A.T. and Abdullahi were not strangers to each other. Gurhan described seeing Abdullahi help A.T. carry groceries to her apartment on a previous occasion. He also testified that he was with Abdullahi on a separate occasion when A.T. came outside and invited Abdullahi to come to her apartment for a meal. Gurhan also described a third meeting he saw between Abdullahi and A.T., testifying that he once waited 30 minutes for Abdullahi to return from A.T.'s apartment while Abdullahi and A.T. had tea.

{¶ 15} Abdullahi also testified. Abdullahi was born in Somalia in 1983, spent 18 years in Kenya as a refugee, and then moved to the United States in 2009 with his wife and children. Abdullahi testified he is now separated from his wife, and acknowledged he had prior convictions, also occurring in 2019, for domestic violence and trespass into a habitation.

{¶ 16} In his testimony, Abdullahi stated A.T. was not being truthful when she told law enforcement and the jury that she did not know Abdullahi prior to October 7, 2019. Abdullahi said he spent a month and one-half talking to A.T. and developed a relationship with her. He said A.T. was lying when she said he had never been inside her apartment prior to October 7, 2019 and that she had invited him over previously for lunch and for tea.

{¶ 17} With respect to the events of October 7, 2019, Abdullahi said he was sitting outside the apartment complex with his friend when A.T. returned to the apartment complex around 2:00 a.m. and invited him to come to her apartment. Abdullahi testified that A.T. let him into the apartment and he sat down on her mattress to talk to her. According to his testimony, Abdullahi had never told A.T. that he was married or that he had children, and he said that on October 7, 2019, A.T. confronted him about having a family. He said A.T. became upset and accused him of deceiving her, and he said she then started throwing plates on the floor. Abdullahi said he tried to leave the apartment but that A.T. quickly came up behind him with a cooking pot and hit him in the face, so he said he then tried to grab her wrists and put his hand on her neck to try to push A.T. away from him. Abdullahi said he scratched A.T.'s neck while trying to push her away from him but that he was not trying to hurt her. Additionally, Abdullahi said he was never undressed while in A.T.'s apartment except for taking off his sweatshirt. He also denied rubbing his penis on A.T.'s backside and in between her butt cheeks.

{¶ 18} Following closing arguments, the trial court instructed the jury on both rape and the lesser-included offense of attempted rape. Following deliberations, the jury found Abdullahi not guilty of aggravated burglary and rape but guilty of kidnapping, attempted rape, and felonious assault. The trial court conducted a sentencing hearing on June 8, 2021 and determined the attempted rape conviction and the kidnapping conviction would merge for purposes of sentencing. Finding the date of the offenses rendered the Reagan Tokes Law applicable to sentencing, the trial court then sentenced Abdullahi to an indefinite sentence with a minimum of 12 years and a maximum of 15 years and informed him of his classification as a Tier III sex offender with lifelong reporting requirements. The trial court journalized Abdullahi's convictions and sentence in a June 24, 2021 judgment entry.

{¶ 19} Abdullahi timely appealed. In a November 11, 2022 journal entry, this court sua sponte stayed the appeal pending the Supreme Court of Ohio's determination of *State*

*v. Hacker*, ___ Ohio St.3d ___, 2023-Ohio-2535. On July 26, 2023, the Supreme Court issued its decision in *Hacker* overruling facial constitutional challenges to the Reagan Tokes Law. *Id.* This court subsequently reactivated the appeal on August 24, 2023.

## II. Assignments of Error

{¶ 20} Abdullahi assigns the following four assignments of error for our review:

> [I.] The trial court erred by denying the Defendant's Rule 29 Motion and failing to dismiss Count 3 (Rape) because there was no evidence of "sexual conduct" or penetration presented at trial.
>
> [II.] Mr. Abdullahi was deprived of a fair trial due to prosecutorial misconduct through misstatements of testimony and law in closing arguments.
>
> [III.] Mr. Abdullahi was deprived effective assistance of counsel.
>
> > 3a. Failure to renew Defendant's Rule 29 Motion at the defense's case.
> >
> > 3b. Failure to object to the prosecutor's misstatements of fact and law in closings.
> >
> > 3c. Failure to object to the Attempted Rape jury instruction.
> >
> > 3d. The totality of trial counsel's performance.
>
> [IV.] The trial court committed plain error in imposing an indefinite sentence under R.C. 2967.271, the Reagan Tokes Law, because it violates the United States and Ohio Constitution.

## III. First Assignment of Error – Crim.R. 29 Motion for Acquittal

{¶ 21} In his first assignment of error, Abdullahi argues the trial court erred in denying his Crim.R. 29 motion for acquittal related to the rape charge.

{¶ 22} Crim.R. 29(A) provides that the court, "on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Review of the denial of a Crim.R. 29 motion and the sufficiency

of the evidence apply the same standard. *State v. Fugate*, 10th Dist. No. 12AP-194, 2013-Ohio-79, ¶ 5, citing *State v. Turner*, 10th Dist. No. 04AP-364, 2004-Ohio-6609, ¶ 8. Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 23} Abdullahi asserts the state failed to present sufficient evidence to convict him of rape and that the trial court erred in denying his Crim.R. 29 motion for acquittal at the close of the state's evidence during the trial. The state charged Abdullahi with one count of forcible rape through anal intercourse. To convict a defendant of rape under R.C. 2907.02(A)(2), the state is required to prove the defendant engaged in sexual conduct with the victim by purposely compelling the victim to submit by force or threat of force. As defined in R.C. 2907.01(A), "sexual conduct" includes "vaginal intercourse between a male and female; anal intercourse * * *; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." Further, "[p]enetration, however slight, is sufficient to complete vaginal or anal intercourse." *Id.*

{¶ 24} Here, Abdullahi argues the state failed to present any evidence of penetration and, accordingly, the trial court should have granted the Crim.R. 29 motion for acquittal on the rape charge. Abdullahi points to A.T.'s testimony that, although she felt Abdullahi's penis in between her butt cheeks, she did not feel his penis inside her anus. The state responds that A.T. also testified that the reason she did not consent to a physical examination at the hospital was because she "didn't think [she] got raped," meaning "[she] did feel his penis. He was going up and down but not the point where it went *fully inside*." (Emphasis added.) (Tr. Vol. I at 119.) The state notes that the statutory definition of sexual conduct requires penetration "however slight," and that, viewing A.T.'s testimony in a light most favorable to the state, there was sufficient evidence that penetration, however slight, occurred and, thus, sexual conduct occurred. R.C. 2907.01(A).

{¶ 25} Having reviewed the record, we agree with the trial court that the state presented sufficient evidence of sexual conduct related to the rape charge to overcome Abdullahi's Crim.R. 29 motion for acquittal. Although A.T. testified at various times she felt Abdullahi's penis on the outer part of her buttocks and in between her butt cheeks but not inside her anus, she also testified that the reason she did not believe she was raped was because she did not feel *full* penetration of Abdullahi's penis. A.T. described an extensive struggle and her repeated efforts to fight Abdullahi off of her, and she testified that he continued to move his penis up and down while holding her down. Additionally, on the medical form the SANE nurse completed during A.T.'s time at the hospital, A.T. answered she was "[u]nsure" whether vaginal or anal penetration had occurred, and the SANE nurse testified she had explained to A.T. that for purposes of the form, "penetration meant full insertion of the penis into the vagina or anal cavity," which is different from "penetration, however slight" required for the statutory definition of sexual conduct. (Tr. Vol. II at 255.)

{¶ 26} From all of this testimony, we agree with the trial court that the question of whether penetration, however slight, had occurred was a question for the trier of fact. The testimony related to A.T.'s understanding of what constituted penetration undercuts Abdullahi's assertion that A.T. was unequivocal that no penetration occurred. Accordingly, the trial court did not err in denying Abdullahi's Crim.R. 29 motion for acquittal. We overrule Abdullahi's first assignment of error.

## IV. Second Assignment of Error – Prosecutorial Misconduct

{¶ 27} In his second assignment of error, Abdullahi argues he was deprived of a fair trial because of prosecutorial misconduct. Through this assignment of error, Abdullahi asserts the prosecutor made misstatements of fact and law during closing arguments that were so prejudicial as to deny him a fair trial.

{¶ 28} Courts afford prosecutors wide latitude in closing arguments, and prosecutors may draw reasonable inferences from the evidence at trial, commenting on those inferences during closing arguments. *State v. Hunt*, 10th Dist. No. 12AP-1037, 2013-Ohio-5326, ¶ 18. The test for prosecutorial misconduct in closing arguments "is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984), citing *United States v. Dorr*, 636 F.2d 117 (5th Cir.1981). " '[T]he touchstone of due process analysis in cases of alleged

prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Wilkerson*, 10th Dist. No. 01AP-1127, 2002-Ohio-5416, ¶ 38, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Thus, prosecutorial misconduct is not grounds for reversal unless the defendant has been denied a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266 (1984).

{¶ 29} Here, Abdullahi concedes he did not object to the prosecutor's statements at trial and thus has waived all but plain error. "A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice." *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Saleh*, 10th Dist. No. 07AP-431, 2009-Ohio-1542, ¶ 68. For an error to be "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule; (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings; and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Specific to allegations of prosecutorial misconduct, "[u]nder a plain error standard, a reviewing court asks whether a defendant ' "would not have been convicted in the absence of the improper conduct." ' " *State v. Lipkins*, 10th Dist. No. 16AP-616, 2017-Ohio-4085, ¶ 23, quoting *State v. Elson*, 10th Dist. No. 13AP-554, 2014-Ohio-2498, ¶ 43, quoting *Saleh* at ¶ 68.

{¶ 30} Abdullahi points to several instances of alleged prosecutorial misconduct during closing arguments. First, Abdullahi notes the prosecutor repeatedly stated the evidence demonstrated that Abdullahi vaginally raped A.T. when neither the indictment nor the testimony at trial supported these statements. In the indictment, the state charged Abdullahi with one count of forcible rape through anal intercourse. Despite the charge in the indictment, Abdullahi argues the prosecutor improperly asked A.T. numerous questions about vaginal rape and that A.T. repeatedly denied that any vaginal penetration occurred. Nonetheless, the prosecutor made the following statements during closing arguments:

> So the sexual conduct is the vaginal and anal intercourse that
> you heard [A.T.] testify to.
>
> * * *

He knew what he was doing when he stripped off his clothes and inserted his penis into her anus and vagina.

* * *

He grabbed her by the wrists, pushed her to the ground, ripped off his own clothes and anally and vaginally raped this woman after strangling her multiple times.

(Tr. Vol IV at 470-76.)

{¶ 31} Abdullahi further argues the prosecutor used these erroneous factual statements to make improper legal misrepresentations deriving therefrom. Specifically, in explaining the definition of sexual conduct, the prosecutor stated, "[w]e don't need to prove this charge with testimony that his penis, his whole penis, was inserted into her anus or her vagina. We don't need that. It is penetration, no matter how slight." (Tr. Vol. IV at 497-98.) Abdullahi argues the recurring reference to vaginal penetration was prejudicial because he was not charged with vaginal rape. He also asserts the prosecutor advocated for an erroneous definition of sexual conduct by stating "the victim used the language, his penis touched my butt. His penis went up and down on my butt. This is insertion, no matter how slight." (Tr. Vol. IV at 470.)

{¶ 32} The state conceded during oral arguments before this court that the prosecutor made misstatements during closing arguments at trial. However, all of these misstatements related to the rape charge. The jury did not convict Abdullahi of rape, instead finding him guilty only of the lesser-included offense of attempted rape. Abdullahi does not assert the evidence was not sufficient to convict him of attempted rape or that the prosecutor made any misstatements relative to attempted rape. In making this argument, Abdullahi refers to the "indicted charges" and does not articulate any prejudice that occurred from the prosecutor's misstatements specifically to the lesser-included offense of attempted rape.

{¶ 33} To the extent Abdullahi argues the misstatements about the rape charge affected the overall fairness of his trial on the other charges, we are mindful that the plain error standard requires Abdullahi to demonstrate that, but for the prosecutor's improper conduct, Abdullahi would not have been convicted. *Lipkins* at ¶ 23. Abdullahi does not

explain how the prosecutor's references to vaginal rape had any bearing on the fairness of his trial on the remaining charges or the jury's consideration of those charges. Thus, even agreeing with Abdullahi that the prosecutor's statements about vaginal rape were improper, Abdullahi is unable to demonstrate the type of prejudice necessary to require reversal based on plain error from prosecutorial misconduct. *See State v. Guade*, 10th Dist. No. 11AP-718, 2012-Ohio-1423, ¶ 20.

{¶ 34} Abdullahi next argues the prosecutor made improper comments on the credibility of his own testimony and of A.T.'s testimony. When recounting Abdullahi's version of events, the prosecutor stated "I think it's safe to say he was not so forthcoming in a lot of his answers. And from my recollection, it was quite difficult to get him to answer the questions." (Tr. Vol. IV at 502.) Then, when remarking on A.T.'s version of events, the prosecutor stated "[i]t's not credible to think that a woman as conservative and timid as her would do anything but tell the truth." (Tr. Vol. IV at 503.) On appeal, Abdullahi argues the prosecutor, through these statements, improperly imparted personal beliefs onto the jury.

{¶ 35} As a general rule "[i]t is improper for an attorney to express his or her own personal belief or opinion as to the credibility of a witness." *State v. Williams*, 79 Ohio St.3d 1, 12 (1997). A prosecutor may, however, comment on the testimony and suggest what conclusions the jury should draw from it and, "[i]n doing so, the prosecutor may express his or her personal opinion if he bases that opinion on the evidence presented in court." *State v. Young*, 10th Dist. No. 18AP-630, 2020-Ohio-462, ¶ 46, citing *State v. Crossty*, 12th Dist. No. CA2008-03-070, 2009-Ohio-2800, ¶ 45, and *State v. Shine-Johnson*, 10th Dist. No. 17AP-194, 2018-Ohio-3347, ¶ 88. A prosecutor improperly vouches for the credibility of a witness " 'when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue.' " *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 200, quoting *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 232.

{¶ 36} Here, the credibility of both A.T. and Abdullahi was the main crux of Abdullahi's argument, with Abdullahi's defense counsel suggesting in the defense's own closing arguments that A.T. was not to be believed and that Abdullahi's version of events was more credible. Given the context of the prosecutor's statements about Abdullahi's and A.T.'s relative credibility, we do not agree with Abdullahi that the prosecutor acted improperly in suggesting the inferences to be drawn from both A.T.'s testimony and

Abdullahi's testimony. *See Young* at ¶ 50 (finding no plain error from prosecutor's comments that the witness "didn't lie" and "[was] believable" because the defense argued, at least in part, that the case hinged on the witness's credibility). We also note that even if these statements did amount to the prosecutor improperly expressing a personal opinion on the truthfulness of the witnesses, Abdullahi does not articulate any specific prejudice flowing from these statements. *Young* at ¶ 48 ("reversible error does not automatically result where the trial was nonetheless fair or where plain error is not demonstrated by the appellant"). Additionally, the trial court instructed the jury that the prosecutor's closing arguments are not evidence, and it is presumed the jury follows the trial court's instructions. *State v. Nichols*, 10th Dist. No. 19AP-113, 2020-Ohio-4362, ¶ 28 (where the trial court instructs the jury that closing arguments are not evidence, a reviewing court presumes the jury followed that instruction and that the verdict is not based on the content of the closing arguments), citing *State v. Fudge*, 10th Dist. No. 16AP-821, 2018-Ohio-601, ¶ 52.

{¶ 37} Lastly under this assignment of error, Abdullahi argues the prosecutor acted improperly by telling the jury not to "get wrapped up in beyond a reasonable doubt." (Tr. Vol. IV at 504.) Again, Abdullahi does not articulate any specific prejudice as a result of these remarks. Moreover, in addition to instructing the jury that closing arguments are not evidence, the trial court also instructed the jury on the legal concept of proof beyond a reasonable doubt. Again, a jury is presumed to follow the instructions of the trial court. *State v. Hicks*, 10th Dist. No. 18AP-883, 2020-Ohio-548, ¶ 23, citing *State v. Shipley*, 10th Dist. No. 12AP-948, 2013-Ohio-4055, ¶ 62. Here, because the trial court properly instructed the jury on the law and the applicable burden of proof, Abdullahi does not demonstrate the prosecutor's remarks prejudicially affected his substantial rights, even if we assume, arguendo, that the statement was improper. *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 47 (10th Dist.), citing *State v. Fox*, 133 Ohio St. 154, 160 (1938), and *Pang v. Minch*, 53 Ohio St.3d 186, 195 (1990).

{¶ 38} Because Abdullahi is not able to demonstrate plain error arising from the prosecutor's alleged misconduct, we overrule Abdullahi's second assignment of error.

**V. Third Assignment of Error – Ineffective Assistance of Counsel**

{¶ 39} In his third assignment of error, Abdullahi argues he received ineffective assistance of counsel.

{¶ 40} In order to prevail on a claim of ineffective assistance of counsel, Abdullahi must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This first prong requires Abdullahi to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. If Abdullahi can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id*. To show prejudice, Abdullahi must establish there is a reasonable probability that, but for his counsel's errors, the results of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id*. at 694.

{¶ 41} In considering claims of ineffective assistance of counsel, courts review these claims with a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Abdullahi contends his trial counsel was ineffective in: (1) failing to renew the Crim.R. 29 motion at the close of trial; (2) failing to object to the attempted rape instruction; (3) failing to object to the prosecutor's improper statements during closing arguments; and (4) the totality of counsel's performance. We address each of the alleged instances of ineffective assistance of counsel in turn.

**A. Failure to Renew Crim.R. 29 Motion**

{¶ 42} Abdullahi's first alleged instance of ineffective assistance of counsel is his trial counsel's failure to renew the Crim.R. 29 motion at the close of the defense's evidence. Abdullahi argues that if his trial counsel had renewed the Crim.R. 29 motion, there is a reasonable probability counsel could have more effectively argued why the motion should be granted and, had the trial court granted the renewed motion, the state would not have had the opportunity to request the instruction on attempted rape.

{¶ 43} As this court has previously held, " '[d]efense counsel's failure to make a Crim.R. 29 motion for acquittal is not ineffective assistance of counsel where such a motion would have been futile.' " *State v. McCall*, 10th Dist. No. 18AP-93, 2021-Ohio-1032, ¶ 18,

quoting *State v. Wallace*, 10th Dist. No. 08AP-2, 2008-Ohio-5260, ¶ 63.  As we explained in our resolution of Abdullahi's first assignment of error, the trial court did not err in denying Abdullahi's Crim.R. 29 motion made at the close of the state's evidence as the state had presented sufficient evidence for the jury to decide whether sexual conduct had occurred within the meaning of the rape charge.  Though Abdullahi argues his trial counsel may have been able to argue more effectively had he renewed the Crim.R. 29 motion at the close of the defense's case, Abdullahi does not point to any additional evidence presented during the defense's case that would require the court to grant the Crim.R. 29 motion that it had previously denied.  Because we find that renewing the Crim.R. 29 motion for acquittal at the close of the defense's case would have been futile, we do not find Abdullahi's trial counsel was deficient in failing to renew the motion.

### B. Failure to Object to Attempted Rape Instruction

{¶ 44} Abdullahi's second allegation of ineffective assistance of counsel is his trial counsel's failure to object to the trial court instructing the jury on the lesser-included offense of attempted rape.  To succeed on a claim of ineffective assistance of counsel based on counsel's failure to file an objection, an appellant must demonstrate that the objection had a reasonable probability of success.  *State v. Jones*, 10th Dist. No. 18AP-33, 2019-Ohio-2134, ¶ 52, citing *State v. Johns*, 10th Dist. No. 11AP-203, 2011-Ohio-6823, ¶ 25.  If the objection would not have been successful, the appellant cannot prevail on a claim of ineffective assistance of counsel.  *Id.*, citing *Johns* at ¶ 25.

{¶ 45} A trial court "must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense."  *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, ¶ 34; *State v. Rutledge*, 10th Dist. No. 17AP-590, 2019-Ohio-3460, ¶ 24 ("an instruction on a lesser-included offense is required only when the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense").  Here, Abdullahi does not argue the evidence did not support an attempted rape instruction, and a review of the record indicates the evidence at trial warranted the instruction.  Despite the evidentiary support for the instruction, Abdullahi again argues the trial court should have granted his Crim.R. 29 motion on the rape charge which would have prevented the state from seeking an

instruction on a lesser-included offense. Having already determined the trial court did not err in denying the Crim.R. 29 motion on the rape charge, and because the evidence presented at trial warranted the attempted rape instruction, Abdullahi cannot show a reasonable probability of success if his trial counsel had objected to the attempted rape instruction. Thus, trial counsel's failure to object to the attempted rape instruction does not constitute deficient performance within the meaning of the *Strickland* test.

### C. Failure to Object to Prosecutor's Closing Arguments

{¶ 46} Abdullahi's third alleged instance of ineffective assistance of counsel is his trial counsel's failure to object to the prosecutor's many allegedly improper statements during closing arguments. As noted above, to succeed on a claim of ineffective assistance of counsel based on counsel's failure to file an objection, an appellant must demonstrate that the objection had a reasonable probability of success. *Jones* at ¶ 52. Additionally, " ' "where the failure to object does not constitute plain error, the issue cannot be reversed by claiming ineffective assistance of counsel." ' " *Young*, 2020-Ohio-462, at ¶ 103, quoting *State v. Roy*, 10th Dist. No. 14AP-223, 2014-Ohio-4587, ¶ 20, quoting *State v. Carson*, 10th Dist. No. 05AP-13, 2006-Ohio-2440, ¶ 51; *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22 (plain error review employs "the same deferential standard for reviewing ineffective assistance of counsel claims").

{¶ 47} Here, Abdullahi makes the same argument he made under his second assignment of error. As we noted in our resolution of Abdullahi's second assignment of error, because of Abdullahi's failure to make an objection at trial, we reviewed Abdullahi's allegations of prosecutorial misconduct under a plain error standard. Having previously held that Abdullahi did not demonstrate plain error regarding prosecutorial misconduct, we find Abdullahi's argument in this regard likewise fails to satisfy the second prong of the *Strickland* test. *Young* at ¶ 104. Thus, Abdullahi's claim of ineffective assistance of counsel based on counsel's failure to object to the various instances of alleged prosecutorial misconduct lacks merit.

### D. Totality of Counsel's Performance

{¶ 48} Abdullahi's final argument related to his allegation of ineffective assistance of counsel is that his trial counsel's overall performance violated his constitutional rights. However, where none of an appellant's individual claims of ineffective assistance of counsel

has merit, the appellant cannot establish a right to relief by joining those claims together. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 296, citing *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 173; *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 222 (where an appellant has not established individual claims of ineffective assistance of counsel, "he cannot establish a right to relief by simply joining those claims together"). Having already determined none of Abdullahi's individual claims of ineffective assistance of counsel have merit, Abdullahi cannot combine them together now.

{¶ 49} Additionally, even if we were to agree with Abdullahi that his counsel's overall performance was deficient under the first prong of *Strickland*, we are nonetheless constrained by the second prong of *Strickland* which requires Abdullahi to demonstrate that but for his counsel's performance, the outcome of the proceeding would have been different. Abdullahi does not demonstrate the requisite prejudice under the second prong of *Strickland*, and, thus, the cumulative effect of the alleged errors did not deprive him of a fair trial.

{¶ 50} Because Abdullahi does not demonstrate he received ineffective assistance of counsel under the *Strickland* test, we overrule Abdullahi's third assignment of error.

## VI. Fourth Assignment of Error – Indefinite Sentence

{¶ 51} In his fourth and final assignment of error, Abdullahi argues the trial court erred in imposing an indefinite sentence under the Reagan Tokes Law because the Reagan Tokes Law is unconstitutional. Abdullahi did not object to the application or constitutionality of the Reagan Tokes Law at trial and, thus, has waived all but plain error. *State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, ¶ 7 (an appellate court has discretion to consider a forfeited constitutional challenge to a statute and may review the trial court decision for plain error).

{¶ 52} Effective March 2019, the Reagan Tokes Law provides that first- and second-degree felonies not already carrying a life sentence are subject to an indefinite sentencing scheme consisting of a minimum and maximum prison term. The Reagan Tokes Law creates a presumption that the offender will be released from incarceration after serving the minimum prison term but gives the Ohio Department of Rehabilitation and Correction ("ODRC") the opportunity to rebut that presumption, in which case the ODRC may

maintain the offender's incarceration up to the maximum prison term set by the trial court at sentencing.  R.C. 2967.271(B), (C), and (D)(1).

{¶ 53} During the sentencing hearing, the trial court determined the Reagan Tokes Law applied to the offenses.  As a result, the trial court sentenced Abdullahi to an indefinite sentence of a minimum of 12 years and a maximum of 15 years in prison.  Abdullahi now argues on appeal the trial court erred in applying the indefinite sentencing structure of the Reagan Tokes Law because the Reagan Tokes Law is unconstitutional.  More specifically, Abdullahi argues the presumptive release portion of R.C. 2967.271 violates both his constitutional right to due process and the constitutional requirement of separation of powers.

{¶ 54} While this appeal was pending, the Supreme Court issued a decision finding the Reagan Tokes Law to be facially constitutional.  *Hacker*, 2023-Ohio-2535, at ¶ 41 (holding the Regan Tokes Law does not violate the doctrine of separation of powers, is not unconstitutionally vague, and does not unconstitutionally deprive offenders of their right to due process).  Following the Supreme Court's decision in *Hacker*, we reject Abdullahi's constitutional challenge to the indefinite sentencing structure of the Reagan Tokes Law.  *State v. Burks*, 10th Dist. No. 21AP-657, 2024-Ohio-17, ¶ 55 (applying *Hacker* to state's appeal regarding trial court's failure to impose the indefinite sentencing scheme required by the Reagan Tokes Law).  Accordingly, we overrule Abdullahi's fourth and final assignment of error.

## VII. Disposition

{¶ 55} Based on the foregoing reasons, the trial court did not err in denying Abdullahi's Crim.R. 29 motion for acquittal, Abdullahi did not demonstrate the requisite prejudice from his allegations of prosecutorial misconduct, Abdullahi did not receive ineffective assistance of counsel, and the trial court did not err in imposing an indefinite sentence under the Reagan Tokes Law.  Having overruled Abdullahi's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and LELAND, JJ., concur.

_____