[Cite as *State v. Christian*, 2026-Ohio-365.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-677 |
| | | (C.P.C. No. 23CR-1762) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Kevin D. Christian, | : | |
| Defendant-Appellant. | : | |
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-678 |
| | | (C.P.C. No. 22CR-1796) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Kevin D. Christian, | : | |
| Defendant-Appellant. | : | |
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-679 |
| | | (C.P.C. No. 21CR-4422) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Kevin D. Christian, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 5, 2026

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond*.

**On brief:** *Mitchell A. Williams*, Public Defender, and *Timothy E. Pierce*, for appellant. **Argued:** *Timothy E. Pierce*.

APPEALS from the Franklin County Court of Common Pleas

DINGUS, J.

{¶ 1}   Defendant-appellant, Kevin D. Christian, appeals judgments from the Franklin County Court of Common Pleas imposing a prison term of 36 months following a verdict of guilty on one count of domestic violence.  The trial court also revoked Christian's community control sentences in two prior domestic violence cases, imposed 16-month prison terms, and ordered those terms be served concurrently with each other and consecutively to the 36-month prison term.  For the reasons that follow, we affirm Christian's conviction, we affirm his sentencing decision in part, and we reverse in part and remand for the court to issue a nunc pro tunc entry reflecting the consecutive sentencing findings it made at Christian's sentencing hearing.

## I.  Facts and Procedural History

{¶ 2}   In April 2023, a Grand Jury indicted Christian on two counts of domestic violence in violation of R.C. 2919.25 in Franklin C.P. No. 23CR-1762.  Christian's charges were third-degree felonies based on three previous convictions for domestic violence, and he was still serving terms of community control under two of those convictions at the time of his indictment for the present case—Franklin C.P. Nos. 21CR-4422 and 22CR-1796.  Plaintiff-appellee, the State of Ohio, accused Christian of assaulting the victim, T.S., during two incidents, one in February and another in March 2023.  Christian pleaded not guilty to the charges, and the cause proceeded to a jury trial.

{¶ 3}   At trial, the state presented the testimony of T.S., as well as two Columbus police officers, a paramedic, and a fingerprint identification technician.  Christian testified in his own defense.  The state asserted that Christian committed domestic violence in February 2023 by repeatedly punching T.S. in the face, and that he committed domestic violence in March 2023 by shoving T.S. and causing extensive property damage to her home.  The defense argued that Christian was not present during either incident and that T.S. manipulated him and lied about the alleged incidents.

### A. The State's Case-in-Chief

{¶ 4}   Officer Christa Charles testified that she responded to the February incident.  Officer Charles found T.S. outside her apartment with her face extremely swollen, bruised, and bleeding.  Police called for medics to treat T.S.'s injuries.  T.S. refused to go to the hospital, despite being urged to do so by both medics and police.  Inside the apartment,

Officer Charles observed blood on the wall. Officer Charles confirmed that she did not see Christian at the scene.

{¶ 5} Officer Madison Hilleary testified that she responded to both the February and March incidents. For the February incident, Officer Hilleary described finding T.S. with severe facial injuries and seeing blood throughout the apartment on the wall, floor, and countertop. For the March incident, Officer Hilleary testified that T.S. reported Christian had pushed her after accusing her of seeing another man. The apartment was severely damaged with overturned furniture and appliances, broken windows, and items strewn about. Officer Hilleary confirmed she did not see Christian at the scene in February or March, though she noted that police apprehended Christian elsewhere in the apartment complex later in the day after the March incident. The state introduced Officer Hilleary's body camera footage from the February incident, which showed T.S.'s injuries, her account of the incident, and the presence of blood in the apartment. The state also introduced screenshots from Officer Hilleary's body camera footage from the March incident, which reflected the state of T.S.'s apartment.

{¶ 6} On cross-examination, Officer Hilleary acknowledged that when she was at the scene in March, she questioned whether the incident would merely be charged as criminal damaging and not domestic violence. She eventually determined that it should be charged as domestic violence, though she believed it was a weaker case compared to the February incident. She also acknowledged that she doubted the veracity of some of T.S.'s statements regarding the March incident. Officer Hilleary clarified that she did not doubt the truth of T.S.'s specific claims that Christian shoved her, that she thought she was in imminent danger, and that she fled the apartment to protect herself.

{¶ 7} Alexander Rafeld, a firefighter and paramedic, testified that he responded to the February incident. He observed swelling and dried blood on T.S.'s face. He recommended she go to the hospital due to head trauma, but she refused. Rafeld identified photos showing injuries to T.S.'s neck that appeared to be from fingernails. He testified that she reported being struck multiple times in the face and choked by her ex-boyfriend. Rafeld testified that T.S.'s injuries were consistent with her account of what happened.

{¶ 8} Victoria Longstreth, a fingerprint identification supervisor from the Franklin County Sheriff's Office, testified that she compared fingerprints from the current case with

those from Christian's three prior convictions. She confirmed that all of the fingerprints were Christian's.

{¶ 9} T.S. testified that she had been in an on-and-off relationship with Christian for five years and had lived together at various addresses. She stopped living with Christian after events that led to two of his previous domestic violence convictions. T.S. testified she continued to maintain contact with Christian after the previous convictions because she loved him and thought they could work things out. She testified that during the February incident, Christian punched her four times in the face, broke her nose, gave her a black eye, and choked her. She called 911 while being attacked and then fled to her car. T.S. provided details about the photographs of her injuries and blood in her apartment, which the state displayed for the jury. For the March incident, she testified that she allowed Christian into her apartment to use the bathroom. Christian then became angry and accused T.S. of seeing other men. T.S. told Christian to leave, and he pushed her hard against the kitchen counter. T.S. fled immediately and called 911. After police arrived, they went back into T.S.'s apartment and found that her television, refrigerator, bed, and other items had been knocked over, broken, or torn up.

{¶ 10} On cross-examination, T.S. admitted that she had been drinking wine during the evening of the February incident. She also admitted that she has sometimes gotten violent with Christian when drinking. However, she denied being physical or violent with Christian during the February and March incidents.

{¶ 11} After the state rested, Christian moved to dismiss both domestic violence charges under Crim.R. 29. The trial court denied Christian's motion.

**B. Christian's Case-in-Chief**

{¶ 12} Christian took the stand and testified in his own defense. He testified that he had lived with T.S. on and off since 2018 and then continuously since August 2022. He testified that he and T.S. were in a toxic relationship and that they were both alcoholics. Regarding the February 2023 incident, he testified that he and T.S. had both been drinking, that he told T.S. she needed to stop drinking before it was time for her night shift at work, and that T.S. attacked him from behind when he attempted to leave the apartment with the bottle of liquor that they had been drinking. He denied punching T.S., claiming she injured herself when she fell and hit the refrigerator after he tried to repel her attack. He testified

that he had learned from previous domestic violence classes that he should leave such a situation, which is why he left the scene before police arrived.

{¶ 13} As for the March 2023 incident, Christian claimed he was not present at the apartment at the time of the alleged incident. He testified that in the early afternoon, T.S. drove him to the hospital for a skin condition, left him at a pharmacy, and security apprehended him when he attempted to return to the apartment complex. He denied pushing T.S. or destroying her property, noting many items in the apartment were his, including the damaged television. On cross-examination, he acknowledged he had previously been convicted of domestic violence involving T.S. in October 2021 and February 2022, and he had an additional domestic violence conviction from 2015.

## C. Closing Arguments, Verdict, and Sentencing

{¶ 14} During closing arguments, the state argued that it had met its burden of proving that Christian committed domestic violence against T.S. based on T.S.'s testimony, evidence of her physical injuries in February, and the extensive property damage in March. The state noted that credibility was important to the case and argued that T.S. was credible based on her willingness to admit to flaws such as her drinking and past violence, her conduct and demeanor on police body camera footage, and her conduct and demeanor on the stand. Conversely, the state argued that Christian was not credible based on his conduct and demeanor reflected in the February 911 call, his flight from both scenes, his demeanor on the stand, and the contrast between his testimony and the physical evidence.

{¶ 15} The defense argued it was up to the jury to decide what happened during the February incident, but it stressed that Christian denied punching or strangling T.S. and that T.S. was intoxicated. As for the March incident, the defense noted that T.S. did not mention an assault in her 911 call, had no signs of injury, responding officers expressed doubts about her credibility, and they questioned whether Christian should be charged with criminal damaging rather than domestic violence. The defense argued that Christian was more honest about the couple's toxicity and substance abuse, and that he was also the victim of T.S.'s violent acts.

{¶ 16} On rebuttal, the state noted that the officers' statements regarding the March incident were merely a part of their discussion, at the end of which they concluded the case was indeed domestic violence and not just criminal damaging. The state further noted that the prosecution gets to decide how to charge a case irrespective of police officers' thoughts,

and they decided there was enough evidence to move forward on a domestic violence charge. The state emphasized that even without visible injuries in the March incident, pushing constitutes domestic violence as it represents an attempt to cause physical harm.

{¶ 17} The jury found Christian guilty of domestic violence for the February 2023 incident and not guilty of domestic violence for the March 2023 incident.

{¶ 18} At the sentencing hearing, the trial court revoked Christian's community control in case Nos. 21CR-4422 and 22CR-1796 and imposed concurrent 16-month prison terms. For the new conviction in case No. 23CR-1762, the court imposed a 36-month prison term and determined that it should run consecutively to the 16-month prison terms. The court voiced concern over Christian's violent misdemeanor history, which included a drunken attempt to break into a woman's home in 2004, punching and strangling a girlfriend in 2015, threatening to kill a person during two separate incidents in 2018, punching and strangling T.S. in 2021, and drunkenly trashing T.S.'s residence and assaulting her in 2022. Regarding its consecutive sentencing decision, the court stated:

> Your sentence on the 23 case is going to run consecutive to your community control cases. I am running those consecutive because you were on community control at that time and this punishment is necessary to protect the public from your future crimes and to punish you and they are not disproportionate to the seriousness of the conduct and the danger posed by you.

(Oct. 25, 2023 Tr. at 18.)

{¶ 19} The trial court's judgment entry of conviction and sentence stated the following regarding consecutive sentences:

> The Court made findings on the record, pursuant to R.C. 2929.14(C)(4), to support consecutive sentences. Considering the facts of this case, the purposes and principals of sentencing, and the requirements set forth in R.C. 2929.14(C)(4), the Court finds that a consecutive sentence is both necessary and appropriate. The Court further finds that (a) a consecutive sentence is necessary to punish Defendant, given the seriousness of the offenses committed; (b) a consecutive sentence is not disproportionate to the seriousness of Defendant's conduct and to the danger the offender poses to the public; (c) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses

of conduct adequately reflects the seriousness of the offender's conduct; and (d) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

(Oct. 31, 2023 Decision & Entry at 2.)

{¶ 20} Christian filed a timely notice of appeal.

## II. Assignments of Error

{¶ 21} Christian assigns the following three assignments of error for our review:

[I.] The jury's verdict of guilt on Count One of the indictment ran against the manifest weight of the evidence.

[II.] Appellant was denied the right to a fair trial memorialized in the Fifth, Sixth, And Fourteenth Amendments of the United States Constitution, Article I, Sections 1, 10, and 16 of the Ohio Constitution, and R.C. 2938.04 as to Count One in the indictment when the prosecutor engaged in misconduct during closing argument.

[III.] The lower court plainly erred per Crim. R. 52(B) and violated Appellant's right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution, and his right to due course of law under Article I, Sections 1 and 16 of the Ohio constitution because the R.C. 2929.14(C)(4) findings necessary to authorize consecutive sentence punishment it made at the October 25, 2023 sentencing hearing are different from the consecutive sentence findings contained in its October 31, 2023 sentencing entry.

## III. Discussion

{¶ 22} In his first assignment of error, Christian asserts his conviction for committing domestic violence against T.S. in February 2023 was against the manifest weight of the evidence.

{¶ 23} When deciding if a conviction is against the manifest weight of the evidence, a reviewing court must determine " 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 1997-Ohio-52, ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A manifest weight challenge can succeed "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 24} In support of his argument, Christian points out that T.S. was drinking prior to the February 2023 incident and she admitted she can be violent when drinking. Christian also points to police officers' statements questioning T.S.'s credibility in March 2023, and notes that the jury did not believe T.S.'s testimony regarding the March 2023 incident. Christian asserts that the physical evidence was consistent with his claim that he merely deflected T.S.'s blows to his face, after which T.S. fell and hit her head.

{¶ 25} We find that it was reasonable for the jury to believe T.S.'s account of the events in February 2023, which was corroborated by physical evidence and the testimony of the paramedic and police officers who were at the scene. Even if this court were to conclude that Christian's explanation of T.S.'s injuries might reach the level of a plausible theory of innocence, such a conclusion would not lead us to believe that T.S.'s account was so lacking in credibility that no reasonable jury could believe her. It was within the province of the jury to believe T.S.'s testimony and to give less weight to Christian's testimony. *See State v. Antill*, 176 Ohio St. 61, 67 (1964) (a jury "may believe or disbelieve any witness or accept part of what a witness says and reject the rest"). We cannot substitute our own judgment for that of the jury in choosing "between credible witnesses and their conflicting testimony." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986).

{¶ 26} We have reviewed the record in its entirety, and we do not find the jury clearly lost its way in resolving any conflicts in the evidence. Accordingly, Christian's conviction is not against the manifest weight of the evidence, and we overrule his first assignment of error.

{¶ 27} In his second assignment of error, Christian asserts the state committed prosecutorial misconduct during its closing argument. Christian argues that the state improperly vouched for T.S.'s credibility, improperly impugned Christian's credibility, and implied that its decision to pursue criminal charges indicated that Christian was guilty.

{¶ 28} In reviewing the propriety of a prosecutor's statements during closing argument, we must view the statements in the context of the entirety of the closing arguments. *State v. Encarnacion*, 2017-Ohio-5530, ¶ 10 (10th Dist.), citing *State v. Noling*, 2002-Ohio-7044, ¶ 94. "A prosecutor's isolated comments are not to be taken out of context and given their most damaging meaning." *Id.* Even if a prosecutor's statements are improper, they are not "grounds for reversal unless the defendant has been denied a fair trial." *State v. McClurkin*, 2009-Ohio-4545, ¶ 66 (10th Dist.), citing *State v. Maurer*,

15 Ohio St.3d 239, 266 (1984). And where, as here, the defense fails to object to any of the prosecutor's statements during closing arguments, we must review the matter under a plain error standard of review. *State v. Whitaker*, 2022-Ohio-2840, ¶ 85. "A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice." *State v. Pilgrim*, 2009-Ohio-5357, ¶ 58 (10th Dist.). To establish plain error in the context of a claim of prosecutorial misconduct, a defendant must show that the outcome of his trial would have been different but for the prosecutor's improper conduct. *State v. Thompson*, 2014-Ohio-4751, ¶ 194.

{¶ 29} Christian argues that the state improperly vouched for T.S.'s credibility by repeatedly describing her as honest and asserting that she was not lying. A prosecutor cannot vouch for a witness's credibility by " 'impl[ying] knowledge of facts outside the record or plac[ing] his or her personal credibility in issue.' " *Thompson* at ¶ 200, quoting *State v. Davis*, 2008-Ohio-2, ¶ 232. "It is improper for an attorney to express his or her own *personal* belief or opinion as to the credibility of a witness." (Emphasis added.) *State v. Williams*, 1997-Ohio-407, ¶ 54. However, a prosecutor is allowed to comment on a witness's testimony and express a personal opinion about the inferences that one might draw from that testimony. *State v. Abdullahi*, 2024-Ohio-418, ¶ 36 (10th Dist.); *State v. Young*, 2020-Ohio-462, ¶ 46; *State v. Shine-Johnson*, 2018-Ohio-3347, ¶ 88. In the context of a case that hinges on the credibility of two opposing witnesses, and in which the defense argues that the state's witness fabricated her allegations and her testimony, it is generally proper for the state to suggest inferences about credibility that could be drawn from the witnesses' testimony or other evidence. *See Abdullahi* at ¶ 36.

{¶ 30} When viewing the state's comments about T.S.'s honesty or truthfulness in context, we find that the state linked its comments to specific evidence and testimony. The state argued that T.S. was honest based on her willingness to admit to her own flaws and bad behavior:

> She admitted to her own flaws. She admitted to getting violent in the past. She admitted to saying she was going to kill him. She admitted to drinking wine before she was scheduled to go into work, and she admitted that she made the stupid decision of letting him back in the house despite the prior incidences of violence. She was honest. She had no reason to lie to you guys. She was honest about everything, even if it made her look bad.

(Tr. Vol. 3 at 414.) The state also argued that T.S. was credible based on her demeanor on the stand at trial:

> [W]hen I played that 911 call . . . . If you were looking at her during that, you saw her facial expression. It was hard to listen to that for her. She was uncomfortable and scared and embarrassed. There's no reason to indicate that she's some phenomenal actress or that she's lying. She was deeply affected by having to relive all of this.

(Tr. Vol. 3 at 416.) The state's comments remained centered on T.S.'s statements and demeanor at trial, and therefore stayed within the permissible bounds of closing argument.

{¶ 31} Next, Christian argues that the state improperly commented on his credibility by stating he was "not being honest about what happened," and improperly suggested that Christian fabricated and tailored his testimony when it stated that Christian "got to listen to the whole trial" prior to testifying. (Tr. Vol. 3 at 419, 416.) Again, when reviewing the statements in context, we find the state did not exceed the bounds of appropriate conduct.

{¶ 32} The state commented on Christian's honesty specifically in the context of his version of the events during the March 2023 incident. The state noted that Christian testified that he was still living with T.S. in her apartment, and that he claimed to have "no idea what had happened to that apartment," after he attempted to return from the hospital. (Tr. Vol. 3 at 419.) The state then argued:

> If he was living there and it was his apartment, do you think he might care a little more, would know what was going on? And yet he claims the first time he ever even saw the apartment was yesterday in court. Then he changes his mind and says, Oh, I did see it before court. He's just not being honest with you guys about what really happened.

(Tr. Vol. 3 at 419.) As for the state's comment about Christian being present at trial prior to testifying, it was in the context of the state's argument regarding what the jury might infer from Christian's calm, professional demeanor in contrast with T.S.'s agitated, combative demeanor while testifying. The state argued that the jury should not necessarily infer credibility from Christian's demeanor, nor should it infer lack of credibility from T.S.'s demeanor:

> It's easy to come in here and be professional when you're able to prepare for it and you know exactly what you need to say and you can sit on a stand and look at everyone and say what's

going on. Whereas [T.S.], she didn't get to see anyone else. She didn't get to see the officers. She had to come in and testify solely from memory in a very uncomfortable situation where she's nervous, she's hurt, she's embarrassed; and then, of course, when the defense attorney gets to question her, it's hard to be a victim and have to try to defend yourself. So you saw there were a few questions she got perhaps a little worked up about, uncomfortable about, kind of wanted to fight back about; but that's no reason to think that she's lying about all of it.

(Tr. Vol. 3 at 416-17.)

{¶ 33} Given the foregoing context, we do not agree that the state's comment about Christian having observed the state's evidence suggested that he provided false testimony that he tailored in response to other witnesses' testimony. Even if the prosecution's statements were improper, Christian has not demonstrated "the type of prejudice necessary to require reversal based on plain error from prosecutorial misconduct." *Abdullahi*, 2024-Ohio-418, ¶ 33 (10th Dist.).

{¶ 34} Finally, Christian argues the state improperly implied that it would not have brought charges against him for the March 2023 incident if he were innocent. However, the jury acquitted Christian on the charge related to the March 2023 incident, and Christian fails to link this alleged misconduct to the charge for which he was convicted. Thus, even if the prosecutor's statement were improper, no prejudice resulted.

{¶ 35} As a whole, the prosecution's closing arguments did not amount to an outcome determinative of plain error. We therefore overrule Christian's second assignment of error.

{¶ 36} In his third assignment of error, Christian asserts that at his sentencing hearing the trial court justified its consecutive sentencing decision under R.C. 2929.14(C)(4)(a) based on the fact that Christian had been under community control, but the sentencing entry indicated different reasons for his consecutive prison terms.

{¶ 37} R.C. 2929.14(C)(4) authorizes a trial court to impose prison terms consecutively as follows:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the

public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 38} During Christian's sentencing hearing, the trial court stated that its decision to impose consecutive sentences was based on the fact that Christian was on community control for prior offenses. The court's consecutive sentencing decision was therefore based on R.C. 2929.14(C)(4)(a). However, the court's sentencing entry recited language from R.C. 2929.14(C)(4)(b) and (c), and it did not mention its findings related to subdivision (C)(4)(a). The state concedes that Christian's sentencing entry does not reflect the consecutive sentencing findings that the court articulated on the record during the sentencing hearing.

{¶ 39} When a trial court properly makes the statutory findings to justify consecutive sentences at a sentencing hearing but fails to incorporate those findings in its sentencing entry, such a failure is considered to be a clerical error that "may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *State v. Bonnell*, 2014-Ohio-3177, ¶ 30, citing *State v. Qualls*, 2012-Ohio-1111, ¶ 15. A trial court has the authority to " 'correct clerical errors in judgments by nunc pro tunc entry to reflect what the court actually decided.' " *State ex rel. Arnold v. Gallagher*, 2018-Ohio-2628, ¶ 17, quoting *State ex rel. Womack v. Marsh*, 2011-Ohio-229, ¶ 13.

{¶ 40} We conclude that Christian's sentencing entry contains a clerical error that can be cured by a nunc pro tunc entry. Accordingly, we sustain Christian's third assignment of error.

## IV. Disposition

{¶ 41} Having overruled Christian's first and second assignments of error, and having sustained his third assignment of error, we affirm in part and reverse in part the judgments of the Franklin County Court of Common Pleas and we remand the matter to that court for a nunc pro tunc sentencing entry.

*Judgments affirmed in part and reversed in part*;
*cause remanded.*

EDELSTEIN and LELAND, JJ., concur.

————————————————